### The People *vs.* The American Art Union.

### The Governors of the Almshouse *vs.* The Same.

Under the 10th section of the 1st article of the constitution, and the 22d section of the article of the revised statutes respecting " raffling and lotteries," it is unlawful for any one to set up, or propose, that is, to hold forth to others that he has, or will have, any articles, although they be works of art, which are to be distributed by lot or chance to any person who, before the distribution, shall have paid any money for the chance of obtaining such articles.

Accordingly, where, by the constitution of the American Art Union, the society was to purchase such works of art as the state of the treasury would warrant, which, at the annual meeting in December, were to become, by lot, the property of the individual members, each member being entitled to one chance, or share, in such distribution, for each $5 by him subscribed and paid, the method in which the distribution was to be made being particularly prescribed in its by-laws; and the society published its plan, showing that for the payment of $5 any person would become a subscriber, and entitled to an engraving, to a copy of the Bulletin of their proceedings, and to the chance of one of a number of paintings to be " distributed by lot among the members, each member having one share for every $5 paid by him ;" *Held* that the mode of distribution adopted by the Art Union was illegal and unconstitutional. Edwards, P. J. dissented.

This was a case agreed upon by the parties, as authorized by the code, for the purpose of obtaining a decision as to the legality of the method of distributing works of art, among its members, adopted by the American Art Union. The facts are stated in the opinions delivered, particularly in that of Edwards, presiding justice.

Mitchell, J. By the constitution of the Art Union, adopted by themselves, the society was to purchase such works of art as the state of the treasury would warrant; which, at the annual meeting in December, were to become, by lot, the property of the individual members, each member being entitled to one chance, or share, in such distribution, for each $5 by him subscribed and paid. (*Art.* 8, 10.) By section 4 of the by-laws, the mode of distribution is prescribed. Each work of art was to be numbered, and its number be placed in a box; the name of every member of the association was to be placed in a similar

Vol. XIII.      73

box: one number was then to be drawn from the first box, and a name was to be drawn from the box of names, and the person whose name was thus drawn was to be the owner of the work represented by the number just drawn; and this process was to be repeated until all the works should have been distributed. (*Sec.* 1 *of art.* 6, *p.* 122.) Before any of the subscriptions for the last year were received, the Art Union published its plan—showing that for the payment of $5 any person would become a subscriber, and entitled to an engraving, to certain numbers of the *Bulletin* of their proceedings, and to the chance of one of a number of paintings, which in December of every year were to be " distributed by lot among the members, each member having one share for every $5 paid by him." After this publication, the Art Union received a great many subscriptions, and bought a large number of pictures, which they were about to distribute according to their agreement thus made with the members, when they were stopped by the charge made that their proceedings were illegal. Article four of 1st Revised Statutes, page 665, is entitled " Of raffling and lotteries ;" but its provisions are not confined to the offenses, technically called raffling and lotteries, among the experts in games of chance. Section 22 not only forbids any one setting up, or proposing, any money, goods, chattels, or things in action, to be raffled for, but also forbids their setting them up, or proposing them to be distributed by lot or chance, to any person who shall have paid any valuable consideration for the chance of obtaining such money, &c. Under this section it is clearly unlawful for any one to set up, or propose—that is, to hold forth to others that he has, or will have, any articles, although they be works of art, which are to be distributed by lot or chance to any person who (before the distribution) shall have paid any money for the chance of obtaining such article. The Art Union certainly did, by its constitution, and articles, and plan, propose, or hold forth, to every person who would become a member, that if he would pay $5, some works of art should be distributed by lot or chance, and that he should have the chance of obtaining one of them. They also held out other inducements to him ; such as that he should certainly have an engraving, and numbers

of the *Bulletin*, and that he would be a patron of the fine arts ; but still they kept distinctly before his eyes, that he was to have the chance of the more valuable article—a fine painting. No one subscribed without the agreement to give him that chance ; although, therefore, other motives entered into the consideration of the member, yet the chance was held out to every one as an inducement to him to pay "the valuable consideration," which the proposers of the scheme were to receive from him. Those other motives only tended to entice a larger number to accept the scheme and to blind themselves, as well as the directors of the institution, to its evil effects. The directors wished to promote the fine arts. They thought it could best be done by procuring a ready market for the works of artists at prices such as liberal men would give from a fund devoted to that purpose. They also concluded that this fund could not be raised in sufficient amount annually by voluntary donations, even from the friends of the art. They therefore appealed to a passion which experience had proved was most powerful even with those who knew nothing of the fine arts. They proposed, as part of the inducement to the payment for a share, that each share should entitle its holder to one chance of obtaining one of a number of valuable paintings which should be distributed by lot. The money paid for each share was then, by agreement, to be paid, and was paid, for the chance of obtaining one of these articles, which were to be distributed by lot, and the Art Union did propose these articles to be distributed by lot or chance. This is the offense described in section 22 of article 4, (1 *R. S.* 665.) That other considerations were mingled with this unlawful consideration, does not make any part of the contract good ; but if this unlawful object of distribution by chance was one of the considerations for the contract, it vitiated the whole contract, and was within that section, otherwise the act might always be evaded by combining any lawful object with one avowedly prohibited by the act. These pictures " were about to be so distributed by lot, and even by public advertisement announced and offered by the said association to be so distributed by lot among over 13,000 subscribers, when they were declared by the district attorney as

forfeited." If there were any doubt whether the offense in section 22 was complete until the articles were about to be distributed, this fact, thus admitted, removes that difficulty. Section 10 of article one of the constitution, is, that " No lottery shall hereafter be authorized, or any sale of lottery tickets allowed within this state." The essential evil of lotteries, and which caused their prohibition in the constitution of 1821, and again in that of 1846, is, that persons are induced to spend their money in them from the hope of obtaining, by chance, a far more valuable return than they pay. Those are the elements of the offense prohibited by section 22 of the part of the revised statutes, which we have just been considering. It is essential to that offense that the purchase should have been made, or valuable consideration given, for this chance. This is to be inferred, also, from the section of the constitution just quoted. By prohibiting the sale of lottery tickets, it shows that the thing to be prohibited is that in which a sale is to take place, and a ticket given to show that the buyer is entitled to a chance. The purchase, then, is made for the sake of the ticket in the lottery. This shows the meaning of " lottery" as the qualifying adjective to " tickets," and so, also, the meaning of the same word when previously used as a substantive. If persons already owning family pictures, or rare works of art, or lands of nearly equal value, or property which does not admit of division into equal parts, and which is too sacred to be sold, choose to distribute by an appeal to lot what has thus come to them before they had any scheme of so distributing it, they are not within any of the evils which the law means to prohibit. Nor is the choice of jurors or arbitrators, or the allotment of senators or judges, within those evils. In neither case is the chance held out or felt as a motive for the giving of any thing. In neither case does the chance tempt one to the expenditure of his money ; but chance is resorted to as the only mode of assigning to some an unequal share when the law or the necessity of the case has already made it indispensable that the shares should be unequal. The lottery is no less an evil because a large proportion of the profits is to be applied for a good purpose. All lotteries which the legislature ever sanctioned were

The People v. The American Art Union.

probably for some such purposes, or were at least so esteemed by the legislatures which sanctioned them. Some were to promote the cause of charity, some the cause of literature, and some the cause even of religion. Yet all were indiscriminately condemned, both by the constitution of 1821 and that of 1846. If this distribution by the Art Union is constitutional, a church might be built by lottery, with 13,000 shareholders of $5 each, each of whom should receive some religious book; but while the pews, amounting to some 200 or 300, could be distributed by lot among some 200 or 300 persons, who would have the luck of drawing the prizes. Charitable institutions could be founded, in which each shareholder should also receive some slight return, while the more lucky would have the exclusive privilege of sending their needy friends to receive the benefit of the charity. Academies and colleges could be founded on the same principle, the fortunate drawers of prizes having the privilege of sending scholars to be taught and supported without charge. In all these cases, and many more that can easily be supposed, no mere pecuniary motive might directly influence the subscriber more than it does here; but in each case the motive, whether it be pecuniary, or economical, or charitable, does exist to obtain the means of a certain enjoyment without paying for it for one's self. If all these schemes can be lawful, when originating with private individuals, they would be no less lawful, if expressly authorized by the legislature, and drawn by agents to be appointed under its authority. Why then, it is said, have so many learned lawyers, and so many moral and religious men sanctioned this scheme? The good object which men have in view often diverts their attention from an examination of the means which are used for that object. Most of this class of men, probably, had no other thought than to pay their subscription, that some deserving painter might receive the benefit of it; most of them, very probably, never examined into the matter, and the long prevailing custom of dealing in lotteries must have left its influence on the community, and in some measure blinded them to its evils, and to the wide spread sphere which it included. Certain lotteries, which it is now contended were the only kind intended to be pro-

hibited, were undoubtedly the principal causes of the mischief that existed, and so might naturally be looked upon as the only cause of that mischief. So, still the professed gambler is regarded as the pest of society, by men of good character, who do not consider it inconsistent with their good character to play for very small sums, in which the motive of gain can have scarcely any influence. Yet in this they violate a known law, although they are not influenced by a base pecuniary motive of making gain, to the ruin of others.

ROOSEVELT, J. concurred with *Mitchell*, J. in considering the mode of distribution adopted by the Art Union illegal and unconstitutional.

EDWARDS, P. J. The parties in each of the above entitled suits have agreed upon a state of facts, which they have embodied in a case, made in accordance with the provisions of the code of procedure, for the purpose of obtaining an adjudication of the question, whether the association known as the American Art Union, have violated any of the laws, or incurred any of the forfeitures imposed by the statutes of this state. The material facts which are contained in the case are, that in the year 1839, a voluntary association, called the Apollo Association, was formed in the city of New-York, for the promotion of the fine arts in the United States. On the 7th day of May, 1840, this association was incorporated by an act of the legislature of the state of New-York, which provided that the persons therein named and such other persons as then were, or might thereafter become, associated with them, were constituted a body corporate by the name of the Apollo Association, for the purpose of the promotion of the fine arts within the United States. The act further provided that the association should have power to make, from time to time, such a constitution, and such by-laws and regulations, as they should judge proper for the election of officers; for prescribing their respective functions, and the mode of discharging them; for the government of the officers and members thereof; and for regulating the annual rate of contri-

butions towards the funds thereof. It also provided that the officers of the association should consist, amongst others, of a committee of management of fifteen members; not professional artists. Subsequently to the passage of this act, and in pursuance of its provisions, the association framed a constitution, which declared that the committee of management should have in charge the general supervision and management of the interests and affairs of the association, and it was provided that they should purchase such works of art executed by artists in the United States, or by American artists abroad, as they might think worthy of selection, and as the state of the treasury should warrant. The constitution also provided that the fund raised by annual subscription should be appropriated under the direction of the committee of management, to defraying the necessary expenses of the association, to the purchasing of the works of art, and to defraying the expense of publishing annually an engraving for distribution among the associates. It was further provided that every subscriber of five dollars or more per annum, should be a member of the association, and should be entitled to the privileges of membership, and that at the annual meeting of the association, the works of art purchased during the year should become, by lot, publicly determined, the property of individual members, each member being entitled to one chance or share in such distribution for each five dollars by him subscribed and paid. The association also adopted a code of bylaws, which amongst other regulations for the management of the affairs of the association, contained a provision as to the manner in which the works of art should be distributed. On the 29th day of January, 1844, an amended act was passed, by which the name of the Apollo Association for the promotion of the fine arts in the United States, was changed to the American Art Union; and it was enacted that the distribution of works of art belonging to the association, provided for in the constitution thereof, should be held on the Friday preceding the 25th day of December in each year, instead of the time stated in the fourth section of the original act. These are all the provisions of the act of incorporation, and of the constitution and

by-laws, which it is essential now to allude to for the purpose of considering the questions which are presented to us for adjudication. Amongst the admitted facts of the case, it appears that each member of the association is entitled to receive an original engraving from an American painting, together with some other similar works of art, and is also entitled to receive the numbers of the *Bulletin of the American Art Union*, which is a journal published under the direction of the association. It further appears that the galleries of the association are, at all suitable times, open to the public; and it is admitted that the members of the association have at all times professed to be actuated by a laudable desire to promote and encourage the fine arts, in making their subscriptions, and in participating in the operations, and in the several privileges of the association, including the chances of drawing pictures by lot at the annual distributions. It is also admitted that it has been the understanding of the association that persons drawing pictures at such distribution, intended to keep them for the enjoyment, and instruction of themselves and their families; but that there never has been any rule, regulation, or contract, established or made by the association, restraining the use or disposition of the pictures so drawn, or to prevent the distribution from operating to vest the pictures as the sole and absolute property of the members drawing them. Upon this state of facts, three questions are presented: 1st. Is the mode of distribution shown by the case, a lottery within the meaning of the constitution of 1821? 2d. If not a lottery within the meaning and intent of the constitution, is the mode of distribution a violation of the general law entitled "Of raffling and lotteries," article 4, title 8, chapter 20, part 1st of the revised statutes, "or of any of the sections thereof?" 3d. If within the latter, and not within the former, are the defendants authorized, by any special or other law, for that purpose, to distribute property in the manner pointed out in this case? The constitution of 1821 provides that "No lottery shall hereafter be authorized in this state; and the legislature shall pass laws to prevent the sale of all lottery tickets within the state, except in lotteries already provided for

The People *v.* The American Art Union.

by law." (*Const.* 1821, *Art.* 7, § 11.) It will be seen by reference to the statutes which existed previous to the adoption of the constitution, that the legislature had passed a general law, declaring that every lottery other than such as had been authorized by law, should be deemed unlawful and a common nuisance. (*Laws of* 1819, *p.* 258, § 1.) The demoralizing effect of lotteries was felt and acknowledged at that time, to such an extent, that it was deemed expedient to make all persons engaged in promoting them the subjects of punishment. But they were in some instances specially authorized by the legislature, in reference to what was supposed to be the public good, and sometimes for charitable and religious objects. But in the convention which established the constitution, the preservation of the morals of the community was deemed paramount to all other considerations, and the legislature was deprived of the power to authorize or sanction any lottery, by the fundamental law of the state. The only embarrassment which can arise in this case is, as to the meaning of the term lottery. It is not defined either in the constitution or the statutes. In its most general sense it might, perhaps, embrace every distribution by lot. But that is, certainly, not its legal meaning; for the constitution itself, in another section, and one which is not made an exception to any other provision in it, declares that as soon as the senate shall meet, after the first meeting to be held in pursuance of the constitution, they shall cause the senators to be divided by lot into four classes of eight in each, and that the seats of the first class shall be vacated at the end of the first year, of the second class at the end of the second year, of the third class at the end of the third year, and of the fourth class at the end of the fourth year. (*Const. of* 1821, *Art.* 1, *sec.* 5.) And under the constitution of 1846 there has been a similar distribution, by lot, of their terms of office, amongst the justices of the supreme court. It is a method of distribution which has been practiced in the partition of real estate, and in the distribution of family pictures and plate amongst the representatives of deceased persons. But it has not been supposed, and it is not now contended, that such distribution is illegal or immoral, although the result has generally been

more beneficial to some of the parties interested than to others. It is well known as a matter of history, that the lotteries against which the constitution and statutes of this state were directed, had certain peculiar objectionable features and characteristics. There were prizes in money, or in something of a pecuniary value, which were exceedingly disproportionate to the amount paid for a ticket. There was in this respect a strong appeal to the cupidity of the public. These prizes were fixed at the time of the sale of the tickets, and formed the sole inducement to the purchase. The proprietors or managers of the lottery reserved to themselves large pecuniary profits. They thus had every inducement to stimulate the passion for gain, which exists in all communities, by holding out the prospect of great advantage with a comparatively slight risk; and the only object contemplated was to gain a pecuniary benefit by these corrupting, demoralizing means. It seems to us that it is barely necessary to refer to the facts which are admitted in this case, to show that the association in question is free from most, if not all, the objectionable features of that species of lottery, which called for the interposition of the convention and the legislature. The act of incorporation of the American Art Union declares that it is constituted a body corporate for the purpose of promoting the fine arts in the United States. The manner in which its ends are to be accomplished is not pointed out; but it is authorized to make a constitution and by-laws for that purpose; subject, of course, to the limitations prescribed by the general laws of the state. The first act, in carrying this purpose into effect, must necessarily be the obtaining of pecuniary means. This is accomplished by an annual subscription which gives a right of membership. There is no prize at that time held out as an inducement to the subscriber; for at that time it has not been ascertained what will be the value or number of the works of art which will be purchased. The money thus subscribed is laid out in the most effectual method of promoting the fine arts; that is, in the purchase of works of art, and, as a necessary consequence, in the encouragement and patronage of artists. The works of art which are purchased are exhibited in a gallery,

which is open, not only to the subscribers but to the public, for the gratification and improvement of the public taste. Each member is entitled to an engraving, and to the numbers of the journal of the association, which are admitted to be an equivalent for the amount of the annual subscription. Thus far there is certainly nothing objectionable either in the acts or objects of the association. But, as the purpose of the association is a continued promotion of the arts, there must be new purchases, and, as a necessary consequence, there must be some periodical disposition made of the works which have been already purchased; and the question arises what disposition is best, having reference solely to the object and end of the association—the promotion of the fine arts? The very causes which give rise to the association show that works of art do not possess a fixed pecuniary value, which renders them salable as an article of merchandise, and it seems to us that there can be little doubt that the best way of improving the public taste, and in this respect promoting the fine arts, is by distributing the works of art owned by the association amongst those who, from a love of art, have been induced to contribute to their purchase. We think that it may be asserted from this statement, that every step which is taken from the original purchase to the final distribution, has reference solely to the avowed object of the association. There is undoubtedly, and must necessarily be, an inequality in the distribution, and that inequality is the result of lot or chance. But can it be said that the object of those who founded, or who now administer the affairs of the association, or of those who have become its members, is to gain a pecuniary advantage? It is clearly not the sole object. The interest which each member has in the distribution, may have more or less influence upon the subscription; but, although it may be one of the inducements, it cannot be said to be one which makes any strong appeal to the cupidity of the public. Neither can the contingent advantage of possessing a work of art, which is not capable of being estimated by any fixed pecuniary standard, and which it is contemplated will be, and, in most instances is, kept as an object of taste, exercise any very corrupting influence upon pub-

lic morals.   Let it be admitted, then, that one of the benefits contemplated by each member at the time of his subscription, is the chance which he will have upon the final distribution, does it follow that this result, which is an incident rather than a principal object, would render an association, in all other respects, meritorious in its influences and purposes, a lottery, within the spirit and meaning of the constitution?   The member who pays his subscription can lose nothing.   It is admitted that he receives an equivalent for his money.   The officers and managers of the association gain nothing, and the public are not exposed to any demoralizing temptation.   It is said, however, that admitting this to be so, and that the evils which the constitution was intended to prevent, do not exist in this case; still, that the distribution by lot, as conducted by the American Art Union, is a lottery within the letter, although not within the spirit of the constitution.   Where the thing to be prevented is particularly described, cases may arise which, although they are not within the spirit, are within the letter of the law.   But where the question arises, as in this case, upon a single word, which is un-defined in the instrument in which it is used, the spirit, or in other words, the meaning and the letter, must be the same. But, it is said that we should take the definition of lexicographers. That would not be a very safe rule to adopt in all cases.   The definition of the word usury, as given in the standard diction-aries, is, " money paid for the use of money ;" but it would not be contended that such is the meaning which would be attached to it if used in a legal sense.   At the time that the constitution was established, art unions were unknown in this country. They were introduced for the sole object of encouraging art— they have been administered and countenanced in the most civil-ized and enlightened portions of the world, by men eminent in their social position, and distinguished for the purity of their lives—they have never, as far as I am aware, either exercised, or been supposed to exercise, a corrupting influence upon public morals ; they were not devised for the purpose, nor with the intent of violating either the letter or spirit of any lottery or gaming act, and, as I think, they have none of those essen-

The People *v.* The American Art Union.

tial elements of mischief which led to the provision contained in the constitution; and, when conducted upon the principles upon which it is admitted that the American Art Union has been conducted, they are not lotteries within the spirit and meaning, nor within the letter of the constitution, or of any statute of this state. But it is said that this association has violated that provision of the statute which declares that "no person shall set up or propose any money, goods, chattels, or things in action, to be raffled for, or to be distributed by lot or chance, to any person who shall have paid, or contracted to pay, any valuable consideration for the chance of obtaining such money, goods, or things in action." (1 *R. S.* 665, § 22.) This provision of the statute was evidently intended to apply to that species of gaming which is known as raffling—that is, to a person who offers money or chattels to be distributed by lot or chance amongst persons who pay for the chance of obtaining the specific sum of money or the specific chattels which are offered. There must be a sum of money, chattel, or thing in action, set up or proposed by one or more persons, to other persons who, in the words of the statute, " shall have paid or contracted to pay a valuable consideration for the chance of obtaining such money," &c. In the case before us, the works of art which are to be distributed were not proposed or set up at the time that the members paid their subscription. At that time they could not be proposed or set up. It was then a matter of uncertainty as to what would, in any event, be distributed. The conclusion to which I have arrived is, that the American Art Union, by its annual distribution of works of art, does not violate either the constitution or laws of this state, and that judgment should be given for the defendant in both of the suits.

Judgment for the plaintiffs, in both suits.

[NEW-YORK GENERAL TERM, June 11, 1852. *Edwards, Mitchell* and *Roosevelt,* Justices.]