## Case No. 15,918.

### UNITED STATES v. OLNEY.

[1 Abb. (U. S.) 275; Deady, 461; 1 Am. Law T. Rep. U. S. Cts. 119; 8 Int. Rev. Rec. 177.] [1]

District Court, D. Oregon. Nov. 2, 1868.

#### LOTTERIES—TAX—TOWN LOT SCHEME.

1. A scheme for the disposal of town lots, by the terms of which a number of lots are sold, and others are reserved to be distributed by lot among the purchasers of the first portion, so that the chance of obtaining one of the reserved or prize lots forms a part of the inducement or consideration for which each purchaser pays the price agreed on for the lot sold to him, is a "lottery" within the operation of a law imposing a tax on lotteries, for purposes of revenue.

[Cited in Hudelson v. State, 94 Ind. 429; State v. Moren, 48 Minn. 559, 51 N. W. 618; State v. Mumford, 73 Mo. 651; Yellow-Stone Kit v. State (Ala.) 7 South. 338.]

2. Various definitions of the term lottery,—collected.

[Cited in Yellow-Stone Kit v. State (Ala.) 7 South. 339.]

3. A revenue law ought to be liberally construed, with a view to attain the object for which it is enacted,—viz: the raising a revenue.

[2] [This action was brought to recover the sum of $100, alleged to be due the United States from the defendant, as a special tax for engaging in the business of a lottery dealer. It was commenced October 17, 1867, and tried by the court, without the intervention of a jury. The facts of the case are stated in the findings of the court, as follows: (1) That the defendant, on March 15, 1867, at Astoria, in the district aforesaid,

1 [Reported by Benjamin Vaughan Abbott, Esq., and by Hon. Matthew P. Deady, District Judge, and here compiled and reprinted by permission. The syllabus and opinion are from 1 Abb. (U. S.) 275, and the statement is from Deady, 461.]

2 [From Deady, 461.]

being the owner of a large number of town lots in such town of Astoria, did then and there divide the greater portion of the same into six hundred parcels, for distribution by lot among the persons who should become the purchasers thereof, as hereinafter stated. (2) That three hundred of such parcels consisted of one lot each, of not less than fifty dollars value; and the other three hundred of such parcels, in and by such division and the scheme hereinafter stated, were denominated prize parcels, and consisted of two, four, and six lots each, of the value of fifty dollars each, and single lots varying in value from one hundred to six hundred dollars, and one house and lot of the value of one thousand dollars; and also, one cottage and three lots of the value of five thousand dollars. (3) That afterwards the defendant prepared a scheme for the sale and distribution of such parcels of lots and presented the same to the public by advertisements in different newspapers in general circulation, and by a descriptive pamphlet, widely circulated, for the purpose of inducing the public to purchase tickets or shares, representing parcels in such scheme. (4) That by the scheme aforesaid, each of the parcels of property aforesaid, were offered for sale at an uniform price of fifty dollars; and that on and before May 15, 1867, the defendant sold all the tickets or shares aforesaid, at the uniform price aforesaid, and thereupon in pursuance of the scheme aforesaid, the number of the lot or lots constituting each parcel was written on separate ballots and sealed up and placed in a box, and the name of each purchaser was written on as many separate ballots as he had purchased tickets or shares, and sealed up and placed in another box; and thereafter, on the day last aforesaid, under the supervision of a committee of three persons, selected in pursuance of such scheme, a ballot was drawn from each of the boxes aforesaid, and the name of the purchaser and the description of the property thus drawn were recorded by a clerk, and then another ballot was so drawn from each of such boxes, and recorded by the clerk as aforesaid, until all ballots were drawn from each box, and recorded as aforesaid; and thereupon the persons whose names were thus drawn, were, in pursuance of such scheme, declared to be the purchasers of the parcel or parcels of property so drawn by them, and the defendant executed deeds to them, therefor, accordingly. (5) That about one third of the contracts for the purchase and sale of the tickets or shares in the scheme aforesaid, were in writing, in two parts, one of which was signed by the defendant, and in these words: "Astoria, May 1, 1867. This certifies that Paul Corno has subscribed for twenty shares in my scheme for the sale and distribution of town lots in Astoria, Oregon, and will be entitled to a warranty deed for the property, which shall be drawn

to him according to the prospectus, on payment of the note given for the purchase money. (Signed.) Cyrus Olney." And the other of which was signed by the subscriber, and in these words: "$1,000. Astoria, May 1, 1867. For value received, I promise to pay to the order of Cyrus Olney, one thousand dollars, in gold coin. This note is given for twenty shares in the Astoria town lot distribution, and is payable when the deed is ready for delivery, according to the prospectus. (Signed.) Paul Corno." (G) That the defendant during the period and between the dates aforesaid, or at any time thereafter, on account of the scheme and drawing aforesaid, did not pay to the United States the special tax, or any part thereof, by law imposed upon lottery ticket dealers. And, as a conclusion of law from the premises, the court finds that the defendant on and between the dates aforesaid, in selling the tickets or shares as aforesaid, in the scheme aforesaid, was engaged in the business of a lottery ticket dealer; and that thereby such defendant became and still is liable to pay to the United States a special tax of one hundred dollars.] [2]

DEADY, District Judge. This action is brought to recover the sum of one hundred dollars, alleged to be due the United States from the defendant, as a special tax for engaging in the business of lottery dealer. It was commenced October 17, 1867, and tried by the court without the intervention of a jury, on November 13 thereafter, and has since been continued from term to term for deliberation and advisement. The facts of the case are stated in the findings of the court.

The law imposing this tax is found in subdivision 6 of section 79 of the internal revenue act of June 30, 1864, as amended by the act of July 13, 1866 (14 Stat. 116), which reads as follows: "Lottery ticket dealers shall pay one hundred dollars. Every person, association, firm, or corporation which shall make, sell, or offer to sell lottery tickets or fractional parts thereof, or any token, certificate, or device representing or intending to represent a lottery ticket or any fractional part thereof, or any policy of numbers in any lottery, or shall manage any lottery, or prepare schemes of lotteries, or superintend the drawing of any lottery, shall be deemed a lottery ticket dealer."

The statute imposes a tax upon a dealer in lottery tickets, and also declares who shall be deemed such dealer, but it does not define or limit the signification of the word "lottery." A person to be liable as a dealer in lottery tickets must, in some of the modes or instances mentioned in the statute, be engaged in the preparation, conduct, or management of a lottery, so that the liability of the defendant turns upon the question, what is a lottery? The answer to this question

must be found in the meaning of the word, as established by usage and authority. I assume, with the argument for the defendant, that the legal and popular meaning of the term coincides, and that it is used in the statute according to its primary and general acceptation. Indeed, I am not aware that the word has any technical or peculiar significance.

The word "lottery" is defined and used as follows by lexicographers and writers: "A distribution of prizes and blanks by chance; a game of hazard, in which small sums are ventured for the chance of obtaining a larger value either in money or other articles." Worcest. Dict. "A disposition of prizes by lot or chance." Webst. Dict. "A scheme for the distribution of prizes by chance." Bouv. Dict. "A kind of game of hazard, wherein several lots of merchandise are deposited in prizes for the benefit of the fortunate." Rees. Cyclopædia. "A sort of gaming contract, by which, for a valuable consideration, one may by favor of the lot obtain a prize of a value superior to the amount or value of that which he risks." Am. Cyclopædia. "That the chance of gain is naturally over-valued, we may learn from the universal success of lotteries." Smith, Wealth Nat. bk. 1, c. 10.

All these authorities agree that where there is a distribution of prizes—something valuable—by chance or lot, that this constitutes a lottery. But the definitions from Worcester and the American Cyclopædia are the most complete. From each of these it expressly appears that a valuable consideration must be given for the chance to draw the prize.

Tried by this standard, it is manifest that the scheme prepared and carried out by the defendant for the sale and distribution of these town lots was a lottery. True, the purchasers of tickets or shares were in any event to get something—at the least, a lot, for the purposes of this scheme estimated to be worth fifty dollars. But it is not probable that any one would have purchased a ticket if it was certain that he would have received nothing in return but one of these so-called fifty dollar lots. If the first three hundred lots could have been sold for fifty dollars each on account of their market value, certainly the defendant would not have been improvident enough to put the other three hundred prize parcels into market at the same price, while their actual value was from one hundred dollars to five thousand dollars each. This is neither reasonable nor probable.

The chance of obtaining five thousand dollars for fifty dollars was the enticing object which the scheme held up to the public as an inducement to purchase the shares, and this "chance of gain," upon which depends "the universal success of lotteries," was to be determined by lot. This scheme has all the attributes and elements of a lottery. It is a distribution by lot of a certain number of prizes among twice the number of persons; and

that, too, of prizes very unequal in value. The certificate of purchase issued by the defendant to each purchaser is a ticket which entitled the holder to the chance of drawing a prize of from two to one hundred times the value of the price of the ticket. It is evident that the first three hundred lots could not have been sold by any ordinary method at fifty dollars each, if at all. This is also probably true of any of the prize parcels. Whatever may have been their intrinsic or future value, the evident aim of the scheme was to sell them for more than their market value, and this was to be accomplished by an appeal to the universal passion for playing at games of chance. The purchase of the ticket and the payment of fifty dollars was made for the chance of obtaining one of the prize parcels, represented to be worth many times that sum. This was a lottery according to the common acceptation of the word. It was a lottery within the definitions in the dictionaries.

It matters not, even if the purchaser was to receive the full value of his money in any event. As a matter of fact, the money was paid for the chance of the prize also, and would not have been paid without this inducement. The sale of the ticket by the defendant gave the purchaser this chance to obtain something more than he paid for. This was dealing in lottery tickets within the purview of the revenue act.

The argument of the defendant assumes that the purchasers of the property bought six hundred parcels in common, and after thus becoming the owners of the same, adopted this method of distributing or dividing it among themselves.

If persons already owning family plate, pictures, or other property, not susceptible of division, or even equal division, choose to distribute by an appeal to lot what has thus come to them before they had any scheme of so distributing it, they are not within the definition of a lottery, nor liable to this special tax. They have not given a valuable consideration for the chance of obtaining something of much greater value—a prize.

The argument of the defendant is ingenious and plausible, but it is based upon an incorrect assumption. It ignores the fact—the mainspring of the whole transaction—that the tickets were sold and purchased for the avowed purpose of giving to each of the purchasers a chance to obtain a prize parcel by means of this subsequent allotment. The division by lot was not an afterthought of the purchasers, but a prominent part of the original scheme of sale and distribution as prepared by defendant. No purchaser bought any particular lot or parcel, or any undivided interest in the whole property. Each purchaser bought the right to have, by allotment, one of the three hundred lots, estimated to be worth fifty dollars each, and the chance of obtaining instead of such lot one of the three hundred prize parcels, represented to be worth from one hundred dollars to five thousand dollars. The chance of obtaining one of these prizes, and even the most valuable one, rather than the fifty-dollar lot, induced the purchaser to buy, and enable the defendant to sell the certificate of purchase. Indeed, the sale of the first three hundred lots, in three hundred parcels, for fifty dollars each, upon the condition that they should be distributed among the purchasers by lot, would itself be a lottery, unless the lots were in fact of equal value, which is very improbable.

The case is in almost every respect the counterpart of the celebrated case of the American Art Union, decided in New York in 1852. The scheme of the art union was that by paying five dollars, any person could become a subscriber, and entitled to an engraving and certain numbers of The Bulletin containing the proceedings of the society, and the chance of obtaining one of a number of valuable paintings which in December of each year were to be distributed by lot among the members. The drawing was to be conducted precisely as in this case, by placing the name of the subscriber in one box and the name of the painting in another. A number being drawn from the latter box, a name was drawn from the former one, and the person whose name was thus drawn was to be the owner of the prize represented by that number.

The supreme court decided that this was a lottery. 13 Barb. 577. The case was then taken to the court of appeals, and argued on behalf of the art union with great ability. The court of appeals affirmed the decision of the supreme court that the scheme was a lottery. 7 N. Y. 228. The proceeding in the New York courts was to enforce the forfeiture of the property proposed to be distributed by this scheme, and the case turned upon the construction or interpretation of the word "lottery" in the prohibition contained in the constitution of the state: "No lottery shall hereafter be authorized in this state."

This action is simply to enforce the collection of a tax imposed by the United States upon all lotteries. A revenue law is not to be strictly construed, but rather the contrary, so as to attain the ends for which it was enacted. With the policy or impolicy of allowing lotteries the revenue act does not interfere. It simply provides for taxing them, whenever and wherever they in fact take place. They are specially and heavily taxed, not for the purpose of encouraging or prohibiting them, but upon the same ground that many other special taxes are laid; because, as a rule, it is well known that their owners and managers receive from the public large gains, without giving any equivalent therefor.

Keeping this end in view, it is apparent that the revenue act ought to be so construed as to include every case of the distribution of property or money which contains the essential elements of a lottery—the payment of a valuable consideration for a chance of ob-

taining by lot something more valuable in return.

It is true, the defendant may have engaged in this scheme without any thoughts of becoming a dealer in what the law deems lottery tickets. Indeed, other motives than actual gain may have induced him to make the sale and distribution that he did. In the prospectus of the scheme, published by him, he asks the question: "Why is this property put into a raffle at prices which average less than half the selling rates?" and answers it as follows: "Only because the sale to citizens, for actual improvement, at full prices, at the rate of three to five thousand dollars a year, on time, as heretofore, is no longer adapted to the circumstances of the proprietor, who has become an invalid, and must hasten to complete the improvements and enterprise which he has in hand."

But even upon this mild view of the scheme, for the purpose of taxation it must be considered, or rather is, a lottery. By it many persons are induced to buy property which has no present market value, and which they otherwise would not purchase at any price, because there is set before them the chance of obtaining by lot a certain prize or piece of property of much greater value than the consideration advanced.

Let judgment be given for the plaintiff for the sum demanded in the complaint, and the costs and expenses of the action. Judgment accordingly.