*Ruggles, O. J.
 

 The plaintiffs, as overseers of * -J the poor of the city of New York, claim to recover from the defendants a penalty of $300, being three times the value of a picture No. 29, and entitled, “ The
 
 *234
 
 Huguenots going to worship in Charleston Harbor'/’ together with the further sum of ten dollars.
 

 The statute under which this recovery is claimed is in these words:
 
 “No person shall set up or propose any money, goods, chattels,
 
 or things in action, to be raffled for,
 
 or to be distributed by lot or chance, to any person who shall have paid, or contracted Ho pay, any valuable considera-
 
 ^gg
 
 tion for the chance of obtaining any such money,
 
 *-
 
 goods, or things in action.
 
 Any person offending against this provision shall forfeit three times the sum of money, or 'value of the articles, so set up, together with the sum of ten dollars, to be recovered by and in the name of the overseers of the poor of the town where the offence was committed.”
 

 The picture above mentioned, together with three hundred and nine others, were about to be distributed by lot or chance, in pursuance of the constitution and by-laws of the corporation of the American Art Union, and were, by public advertisement, announced and offered to be distributed by lot as aforesaid, among 13,000 members and subscribers. This took place immediately previous to the commencement of the legal proceeding to recover the penalty in question. The picture No. 29 was of the value of $100.
 

 Pictures are chattels; the Art Union proposed to distribute them by lot or chance among'its subscribers; each subscriber had paid five dollars, which made him a member of the corporation and entitled him to a chance in such distribution of obtaining the picture in question as a prize. The scheme of the Art Union and the proposition to distribute the pictures by lot, is, therefore, a violation of the statute above recited, unless this association has some special authority which exempts them from its operation.
 

 The act of 29th January 1844, entitled “An act to amend the act to incorporate the Apollo Association for the promotion of the fine arts, passed May 7, 1840”
 
 *235
 
 (Laws of 1844, p. 7), is supposed to create such exemption, and to operate as a repeal of the statute against raffling and lotteries, so far as respects the American Art Union.
 

 The American Art Union was originally incorporated by the name of the Apollo Association, with power, among other things, of making such a constitution, by-laws and regulations as they should judge proper for certain enumerated purposes. The 4th section of the act directed the annual election of officers to be held on the third Monday in December; but the act did not give or purport to give the corporation the power of distributing ^pictures or other property by lot, nor of regu236] lating such distribution by their constitution or by-laws.
 

 The corporation made and adopted a constitution on the 23d of December 1843, and by its 10th section it was provided, that at the annual meeting of the association in December, the works of art purchased during the year should become, by lot, publicly determined, the property of individual members, each member being entitled to one chance or share in such distribution, for each five dollars by him subscribed and paid.
 

 By the first section of the act of 29th January 1844, the name of the Apollo Association was changed to The American Art Union; the second section is as follows:
 
 “
 
 The distribution of the works of art belonging to the association, provided for in the constitution thereof and the annual election of officers, shall be held on the Friday preceding the 25th day of December, in each year, instead of the time stated in the 4th section of the act hereby amended.”
 

 The defendants insist that this statute recognises the distribution by lot of the works of art belonging to the corporation as a lawful act; and, therefore, repeals the statute against raffling and lotteries, first above quoted, so far as it would otherwise have made such
 
 *236
 
 distribution illegal. But if the scheme of the association for the purchase and distribution of its works of art by lot or chance, is a lottery within the meaning of the state constitution of 1821, which was in force at the time of the passing of the statutes above mentioned, the legislature had no power to authorize or sanction it; and the second section of the act of 1844 is, therefore, inoperative, either as a grant of power or a recognition of such grant.
 

 This brings us, therefore, to the real question in the case, namely, whether the plan or scheme of the Art Union, above mentioned, is a lottery within the constitutional prohibition. The 11th section of the 7th article of the constitution of 1821 in these words:
 
 “
 
 No lottery shall hereafter be authorized in this state; and the legislature shall pass laws to prevent the sale of all lottery-tickets within this state, except in lotteries already provided for by law.” *This prohibition .. ^ ^ is general. It must be held to embrace all lotteries, unless there be some very clear and satisfactory reason for understanding it in a more limited sense.
 

 It was urged upon the argument, that public lotteries for pecuniary prizes, as a means of raising revenue, were alone within the contemplation of the framers of the constitution. But lotteries have never been created within this state, for the purposes of general revenue, and there is, therefore, no ground for believing that the prohibition was intended to be limited to lotteries for that object. This would have been restraining a mischief which did not exist, and tolerating that which did. Lotteries had been authorized by the legislature, for the benefit of colleges, for the making of roads, for the building of bridges, for the improvement of ferries, for the erection of hospitals, and for various other purposes equally commendable and beneficial. All these were clearly within the prohibition. The prohibition was not aimed at the objects for which lotteries had been author
 
 *237
 
 ized, but at that particular mode of accomplishing such objects. It was founded on the moral principle, that evil should not be done, that good might follow, and upon the more cogent practical reason, that the evil consequent on this pernicious kind of gambling greatly overbalanced, in the aggregate, any good likely to result from it. The promotion of the fine arts is undoubtedly a commendable object, but the prohibition contains no exception in its favor on that ground.
 

 Payment of the prizes in money, is not one of the essential ingredients of a lottery. Wherever the scheme of distribution is such, that if the payment of the prizes were in money, it would be a lottery, it will be equally so, although the prizes are payable in lands or in chattels. In 1820, the city of Albany was authorized by a statute to dispose of its public lands, by a lottery, not to exceed in amount $250,000. The distribution of their lands by lot or chance, was denominated a lottery in the title and in the body of the statute. (Laws of 1820, p. 224.) Payment of prizes in money, therefore, is not essential to a lottery, within the meaning of the word, as used by the legislature before the adoption of the constitution of 1821.
 

 * 238 1 *Thc intention of the framers of the constituJ tion undoubtedly was, to forbid the future granting of any such lotteries as had, at any time previously, been authorized by law, and by requiring the legislature to pass laws to prevent the sale of
 
 all lottery-tickets,
 
 to put an end to all such distributions of money or goods by lot or chance, as had heretofore been forbidden by statute under the name of private lotteries. A reference to the statutes of the colony and the state against private lotteries will show conclusively, that all schemes for the distribution of private property of any description by lot or chance, were regarded by the legislature as coming within the denomination of private lotteries.
 

 The sale or distribution “of any goods, wares and
 
 *238
 
 merchandises, by. way of or in manner of lottery,” was prohibited in the province, as early as 1721, by an act entitled “An act to prevent private lotteries in the province of New York.” The same thing was done by another colonial statute in 1771, with a similar title. (Van Schaack’s Laws, pages 124 and 674.) The statute of 1783 contains a similar provision (1 K. & R. 35); and this is repeated in the act of 1813. (2 Revised Laws 188.)
 

 That the prizes to be distributed by the Art Union scheme had no fixed market value, is of no importance in relation to the point in question. To render it material, it would be necessary to show that they were of no value; this is by no means true; they are valuable, although not readily saleable in market for what the artists believe them to be worth. They are articles of merchandise; the intention of the scheme is to sell them for more than they can be sold for at private sale; and this was to be brought about by an appeal to the universal passion for playing at games of chance. The indulgence of this passion was precisely what the constitution intended to repress and prohibit. Nor is it material to the question in hand, that the prizes were not known and designated, when the tickets or chances were subscribed and paid for. The scheme in this respect is more objectionable than a scheme in which the prizes are previously *fixed, because it ^gg affords less security to the subscribers that the *- chance purchased is worth the money paid for it.
 

 The Art Union scheme is a lottery, within the ordinary meaning of the word, as defined in the English dictionaries. It is “ a distribution of prizes by chance,” which is one of the definitions of a lottery by Johnson and Webster. It is “ a kind of game of hazard, wherein several lots of merchandise are deposited in prizes for the benefit of the fortunate.” (Rees’s Cyclopaedia.) It is a game of hazard in which merchandise is deposited as
 
 *239
 
 prizes for the advantage of those who gave the tickets which entitle them to such prizes. (12 Brewster’s Ed. Encyclopaedia 258.)
 

 The scheme in question has all the attributes and elements of a lottery. It is a distribution by lot of a small number of prizes among a great number of persons; the prizes and blanks are drawn in the manner in which prizes are drawn in other lotteries. The certificate of membership is a ticket which entitles the holder to a chance for a prize of a much greater value than the price of the ticket. It is a lottery, according to the common acceptation of that word; it is a lottery, within the definitions in the dictionaries; it is a lottery, within the meaning of the word, as used in the legislation of the colony and state of New York for more than a century; and we should be trifling with and perverting the language of the constitution, if we were to say, that it is not a lottery within its prohibition.
 

 If no lotteries had existed, excepting such as is contained in the Art Union scheme, it is not probable that they would have been forbidden by the constitution, or by law. Its mischiefs are certainly not so apparent, as if its prizes were to be paid in money, or as it would be, if framed for the purpose of enticing the necessitous and improvident into its hazards. But this case cannot be decided according to the views we may entertain of the probable good or evil consequent upon the execution of the scheme. The constitution took away from the legislature the power of determining whether this or any other lottery was of good or evil tendency, and certainly did not intend to confer *that-power on the judicial tribunals. If it were to be admitted, that the scheme is entirely harmless in its consequences, it would form no ground for making it, by judicial construction, an exception to the general and absolute constitutional prohibition. The constitution of 1846 contains a provision against lotteries, and the sale of
 
 *240
 
 lottery-tickets, substantially like that in the constitution of 1821. The judgment below must be affirmed.
 

 Judgment affirmed.
 
 [1]
 

 Edmonds, J., dissented.
 

 [1]
 

 A gift concert is a lottery, within the meaning of the statute. Negley v. Devlin, 12 Abb. Pr. (N. S.) 210. So is a sale of packages of prize candy. Hall
 
 v.
 
 Ruggles, 65 Barb. 432 ; s. c. 56 N. Y. 424 ; Peaslee’s Case, 10 Phila. 203. And see Commonwealth
 
 v.
 
 Manderfield, 8 Ibid. 457 ; United States v. Olney 1 Deady 461.