## UNITED STATES *v.* ZEISLER.

### (*Circuit Court, N. D. Illinois.* March 14, 1887.)

1. LOTTERIES—MAILING CIRCULARS—INDICTMENT.
    The effect of Rev. St. U. S. § 3894, prohibiting the mailing of lottery circulars, etc., is to make any matter concerning lotteries unmailable, and to subject the sender of any such matter by mail to the penalty therein provided.

2. SAME—FLOATING MUNICIPAL BONDS.
    When a city or a government, in order to make an inducement for people to buy their bonds, holds out large prizes to be drawn by chance, or determined by lot in the manner in which prizes are usually determined in honestly conducted lotteries, the mailing of circulars concerning such drawings, past and future, is a mailing of lottery circulars, within Rev. St. U. S. § 3894.

Indictment under Rev. St. U. S. § 3894, for sending a lottery circular though the mails.

*W. G. Ewing,* U. S. Dist. Atty., for the United States.

*Kraus, Bracket & Mayer,* for defendant.

BLODGETT, J. The defendant is charged by the indictment in this case with willfully and knowingly depositing in the post-office of the United States, to be conveyed by mail, a circular concerning a lottery; that is to say, a circular addressed to one August Muller, entitled "Fortune, Authentisches Central Ziehungsblatt," and concerning divers lotteries therein mentioned. Upon the trial the defendant admitted sending the circulars through the mail as charged, and a verdict of guilty was rendered; whereupon defendant entered a motion for new trial, and in arrest of sentence, on the ground that the matter sent through the mail did not concern or relate to a lottery, within the meaning of section 3894 of the Revised Statutes, under which the indictment was found. Section 3894 reads as follows:

"No letter or circular concerning lotteries, so-called 'gift concerts,' or other similar enterprises, offering prizes, or concerning schemes devised and intended to deceive and defraud the public, for the purpose of obtaining money under false pretenses, shall be carried in the mail. Any person who shall knowingly deposit or send anything to be conveyed by mail, in violation of this section, shall be punished by fine of not more than $500, nor less than $100, with costs of prosecution."

The effect of this statute is to make any matter concerning lotteries unmailable, and subjects the persons sending such matter by mail to the penalty therein provided. It appears from the proof that the city of Vienna, in the empire of Austria, in 1874, issued bonds for 100 guilders each, to the amount of 30,000,000 guilders, to be refunded within 50

years in accordance with the drawing plan attached to each bond. The bonds were divided into 3,000 series, and each bond showed the series to which it belonged, and its number in its series. The bonds drew no interest, and quarterly drawings were to be made from a wheel of fortune, and the numbers drawn from such wheels determined the bonds to be paid within three months from such drawing, and the amount to be paid on each. At each drawing, say 1,200 numbers, corresponding to the number of the bonds, were drawn from the wheels of fortune. The number first drawn entitled the holder of the bond corresponding to that number to a very large prize,—say, for the earlier drawings, of 200,000 guilders, and for the later drawings something less, say about 150,000 guilders; but the first-drawn number always took this large prize, which varied, according to the time of the drawing, from 200,000 to 150,000 guilders. There was also at each drawing a prize of say 50,000 guilders, which went to the holder of the bond corresponding with the second number drawn from the wheel; a third prize of 10,000 guilders, which went to the holder of the bond corresponding to the third number drawn; five prizes, of 1,000 guilders each, which went to the holders of the bonds corresponding to the fourth, fifth, sixth, seventh, and eighth numbers drawn; and twelve smaller prizes, of 400 guilders each, which went to the holders of the bonds corresponding to the next twelve numbers drawn; and the holders of all the other bonds indicated by the numbers drawn at each drawing were entitled to be paid 130 guilders on each bond, which canceled and paid such bonds. I have described the prizes provided in the drawing plans for each drawing during the first 10 years, which included the quarterly drawings from July 1, 1874, to April 1, 1884. The later drawings varied somewhat in the amounts of the prizes, but the prizes were all determined by lot, in the same way as those I have described. For illustration, at the last drawing, which was to take place March 1, 1924, the largest prize was 150,000 guilders, the next 10,000 guilders, the next 5,000 guilders, 5 of 1,000 guilders each, 125 of 250 guilders each; and the remaining 3,585 bonds would get 200 guilders each; so that a purchaser of one of these bonds had the chance to draw, within a very few months after their issue, 200,000 guilders, or 50,000 guilders, or 10,000 guilders, or 5,000 guilders, or 1,000 guilders, or 400 guilders, or the amount of the face of the bond and 30 guilders.

The circulars which the defendant sent through the mail announced the results of drawings from time to time, and announced when the next drawing would take place, not only in regard to these Vienna city bonds, but divers other bonds issued by other European cities and governments, without interest, and payable with prizes according to schemes or drawing plans substantially like the Vienna bonds.

If these drawings determined only the time when these bonds would be paid, I should say that the mere determining of that time by lot or drawing would not give them the characteristics of a lottery; but when a city or a government, in order to make an inducement for people to buy their bonds, holds out large prizes to be drawn by chance, or determined

by lot in the manner in which prizes are usually determined in even an honestly conducted lottery, it seems to me it comes clearly and distinctly within the inhibiting clause of the statute under which this indictment is found. The mere reading of one of these bonds, and the drawing plan annexed to it, which is put in evidence, shows that it was the intention to stimulate the sale of the bonds by these large prizes, which were to be determined at every drawing, and which every holder of a bond had the chance of obtaining; and hence it seems to me that the purpose of the scheme was not only to determine by lot when the bonds should be paid, but also to determine certain extraordinary chances to the holders of the fortunate numbers drawn. The mere fact that these bonds are authorized by the law of a foreign country, and sanctioned by the policy of such country, does not, as it seems to me, in the least degree affect the question in this case. In *Governors of the Alms House, etc.,* v. *American Art Union,* 7 N. Y. 228, a lottery was defined to be "a scheme for the distribution of prizes by chance;" and the same definition is given in *Thomas* v. *People,* 59 Ill. 160, and *Dunn* v. *People,* 40 Ill. 465.

The bonds in question certainly involved a lottery, within the meaning of the cases I have cited, and many more to the same effect might also be quoted. The circular sent through the mail was intended to induce persons to purchase and deal in these bonds with the hope of becoming the lucky winners of some of the high prizes to be distributed at each drawing; and the fact that the purchasers of the bonds were, by the drawing plan, to get back their principal, and in the aggregate what is equivalent to a very small rate of interest upon that principal, does not, as it seems to me, change the character of the transaction, or relieve it from the characteristic features of a lottery; that is, that high prizes, out of all due proportion to the amount of money paid for a bond, were to be drawn for, and distributed by chance among the holders of these bonds, in the same manner as the prizes are determined in an ordinary lottery.

The motion for a new trial is overruled, and a fine of $100 imposed upon the defendant. I make this fine the lowest that the statute will allow, because this seems to have been his first offense, so far as this court is advised, and the defendant has perhaps acted under the advice of counsel, upon the belief that the scheme did not impinge upon the statute of the United States.