# Yellow-Stone Kit *v.* The State.

*Indictment for Carrying on Lottery.*

1. *Lottery; what constitutes.*—A conviction can not be had for setting up or carrying on a lottery (Code, § 4068), on proof that the defendant publicly distributed by lot a few prizes among a large number of ticket-holders, unless it is also shown that a valuable consideration was paid for the tickets, directly or indirectly; and this element of the offense is entirely wanting in this case, where the evidence showed that the tickets were distributed gratuitously among the persons present at each of the exhibitions, or performances, given by the defendant daily and nightly, for several weeks, in a large tent which was capable of holding several thousand people, though seats were provided for less than one thousand; that the entertainment consisted of acrobatic feats, magic-lantern, music, dancing, &c., during the intervals of which defendant

[Yellow-Stone Kit v. The State.]

sold his medicines, claiming for them highly curative properties; that a fee of ten cents was charged for a seat, but nothing for admittance to the tent, except on the last night, when ten cents was charged; that the prizes were drawn and distributed, as per previous announcement, at the close of the last performance, after the doors had been opened to the public, and that the holders of tickets were not required to be present at the drawing.

FROM the City Court of Mobile.

Tried before the Hon. O. J. SEMMES.

The indictment in this case charged, in a single count, that the defendant "set up, or was concerned in setting up or carrying on a lottery, against the peace," &c. On all the evidence adduced, which it is unnecessary to state, the defendant requested the court to instruct the jury that, if they believed the evidence, they must find him not guilty; which charge the court refused, and the defendant excepted. Many other charges were asked and refused, and exceptions reserved, but they require no notice.

McCARRON & LEWIS, and B. M. ALLEN, for appellant. Lotteries are a species of gaming, and the statutes for their suppression are aimed at the gaming feature. A distribution of prizes, or money, by lot or chance, is not necessarily a lottery—the gaming feature must be added; that is, a valuable consideration must be paid, however small, for a chance to draw or win something of greater value. Tested by the definitions laid down in all the adjudged cases, as well as other authorities, this element of the offense was entirely wanting in the case at bar, and the affirmative charge asked by defendant ought to have been given.—Worcester's Dictionary; Amer. Encyclopædia; *United States v. Olney*, 1 Abb. C. C. 275; Bish. Stat. Crimes, § 952; *State v. Shorts*, 3 Vroom, N. J. 398; *Buckalew v. State*, 62 Ala. 334; *Eslava v. State*, 44 Ala. 406; *Kohn v. Kohler*, 96 N. Y. 362, or 48 Amer. Rep. 628; 137 Mass. 250; *People v. Payne*, 3 Denio, N. Y. 88. In all the cases cited for the State, a valuable consideration was paid, directly or indirectly, for a chance, or ticket.

WM. L. MARTIN, Attorney-General, and LESLIE B. SHELDON, for the State.—The fact that the defendant distributed prizes by lot, or chance, is not denied; and the only question is, whether he received, directly or indirectly, from the holders of tickets, a pecuniary or other valuable consideration. The whole arrangement, as disclosed by the evidence, seems to

[Yellow-Stone Kit v. The State.]

have been a scheme by which the defendant hoped and expected to draw a large crowd to his daily exhibitions, at which he sold his so-called medicines; and he thereby reaped an indirect profit, though nothing was charged for admittance to the tent. But, in addition to this indirect profit, a charge for admittance was made at the last performance, when the prizes were distributed. On all the evidence, the inference is irresistible, that the scheme was a lottery, or an attempted evasion of the statute against lotteries.—*State v. Shorts*, 3 Vroom, N. J. 398, or 90 Amer. Dec. 668; *State v. Mumford*, 73 Mo. 647; *State v. Willis*, 78 Maine, 70; *Whitney v. State*, 10 Ind. 404; *Randle v. State*, 42 Texas, 589; 41 Texas, 292; *Com. v. Manderfield*, 8 Phila. 457; *State v. Clark*, 33 N. H. 329; *Thomas v. State*, 59 Ill. 160; *Wilkinson v. Gill*, 74 N. Y. 63.

SOMERVILLE, J.—The defendant was convicted of the offense of carrying on a lottery in this State.

The case turns largely on what is to be taken as a proper definition of the word *lottery*, within the meaning of the statute and the Constitution of Alabama.—Code, 1886, §§ 4068-4069; Const. 1875, Art. IV, § 26.

The word can not be regarded as having any technical or legal signification different from the popular one.

It is defined by Webster as "a distribution of prizes by lot, or chance." This definition is substantially adopted by Bouvier and Rapalje, in their law dictionaries.

Worcester defines it as "a distribution of prizes and blanks by chance; a game of hazard, in which small sums are ventured for the chance of obtaining a larger value." So, the American Cyclopædia thus defines a lottery: "A sort of gaming contract, by which, for a valuable consideration, one may by favor of the lot obtain a prize of a value superior to the amount or value of that which he risks."

In *Buckalew v. The State*, 62 Ala. 334, it was said, after citing Webster's definition, that "whenever *chances are sold*, and the distribution of prizes determined by lot, this, it would seem, is a lottery. This, we think, is the popular acceptation of the term."

In Bishop on Statutory Crimes, § 952, it is said: "A lottery may be defined to be any scheme whereby one, on paying money or other *valuable thing* to another, becomes entitled to receive from him such a return in value, or nothing, as some formula of chance may determine."

[Yellow-Stone Kit v. The State.]

In *Hull v. Ruggles*, 56 N. Y. 424, the New York Court of Appeals adopts the following as the result of the accepted definitions: " Where a *pecuniary consideration is paid*, and it is determined by lot or chance, according to some scheme held out to the public, what and how much he who pays the money is to have for it, that is a lottery." This definition is approved in *Wilkinson v. Gill*, 74 N. Y. 63; 30 Amer. Rep. 264, as the popular meaning of the word, and one proper to be adopted with a view of remedying the mischief intended to be prevented by the statutes prohibiting lotteries; and it is said: " Every lottery has the characteristics of a wager or bet, although every bet is not a lottery."

It may be safely asserted as the result of the adjudged cases, that the species of lottery, the carrying on of which is intended to be prohibited as criminal by the various laws of this country, embraces only schemes in which a *valuable consideration* of some kind is paid, directly or indirectly, for the chance to draw a prize.—*United States v. Olney*, 1 Deady, 461; s. c., 1 Abbott, U. S. (C. C.) 275; *Governor v. American Art Union*, 7 N. Y. 228; *Ehrgott v. Mayor*, 96 N. Y. 264; 48 Amer. Rep. 622; *Bell v. State*, 5 Sneed (Tenn.) 507; *Com. v. Thacher*, 97 Mass. 583.

There is no law which prohibits the gratuitous distribution of one's property by lot or chance. If the distribution is a pure gift or bounty, and not in name or pretense merely, which is designed to evade the law—if it be entirely unsupported by any valuable consideration moving from the taker—there is nothing in this mode of conferring it which is violative of the policy of our statutes condemning lotteries, or gaming. We may go further, and say, that there would seem to be nothing contrary to public policy, or *per se* morally wrong, in the determination of rights by lot. A member of the college of Christian Apostles, as sacred history informs us, was once chosen by lot. And under the law of this State a tie vote on a contested election of any State officer is required to be settled in the same mode. So, our statutes authorize a distribution of property owned by joint tenants to be made by lot, under the direction of the judge of probate.

These are not the evils against which the law is directed. The gratuitous distribution of money or property by lot has never prevailed to such extent as to require police regulation at the hands of the State, nor, so long as human nature remains as it now is, and has been for so many thousand years,

is it likely ever to be otherwise. The history of lotteries for the past three centuries in England, and for nearly a hundred years in America, shows that they have been schemes for the distribution of money or property by lot, in which chances were sold for money, either directly or through some cunning device. The evil following from them has been the cultivation of the gambling spirit—the hazarding of money with the hope by chance of obtaining a larger sum, often stimulating an inordinate love of gain, arousing the most violent passions of one's baser nature, sometimes tempting the gambler to risk all he possesses on the turn of a single card, or cast of a single die, and "tending, as centuries of human experience now fully attest, to mendicancy and idleness on the one hand, and moral profligacy and debauchery on the other."—*Johnson v. State*, 83 Ala. 65. It is in the light of these facts, and the mischief thus intended to be remedied, that we must construe our statutory and constitutional prohibitions against lotteries, and devices in the nature of lotteries.—*Ehrgott v. Mayor*, 48 Amer. Rep. 622.

The cases on this subject are very numerous, and while the courts have shown a general disposition to bring within the term "lottery" every species of gaming, involving a distribution of prizes by lot or chance, and which comes within the mischief to be remedied—regarding always the substance and not the semblance of things, so as to prevent evasions of the law—we find no decision in which the element of a valuable consideration parted with, directly or indirectly, by the purchaser of a chance, does not enter into the transaction.—*Buckalew v. State*, 62 Ala. 334; *The State v. Bryant*, 74 N. C. 207; *Com. v. Wright*, 50 Amer. Rep. 306; *State v. Clark*, 66 Amer. Dec. 723; *State v. Shorts*, 90 Amer. Dec. 668; *Wilkerson v. Gill*, 30 Amer. Rep. 264; *Governor v. Amer. Art Union*, 7 N. Y. 228; *State v Mumford*, 73 Mo. 747; *Hull v. Ruggles*, 56 N. Y. 424; *Thomas v. People*, 59 Ind. 160; *Dunn v. People*, 40 Ill. 465; *Seidenbender v. Charles*, 8 Amer. Dec. 682; *United States v. Olney*, 1 Deady, 461; *Bell v. State*, 5 Sneed, 507; Bishop on Stat. Crimes, (2d Ed.) § 952; 2 Whart. Cr. Law (9th Ed.), § 1491.

In this case, it is not denied that the defendant has distributed presents or prizes to the holders of tickets given to the public—eight prizes among some eight thousand ticketholders. It is also uncontroverted, that this distribution has been made by lot, or chance. This was done by two children chosen from the audience, who selected by lot eight tickets

from a large number of *duplicates*, which were thrown by the defendant at random on the stage or platform. These tickets were numbered, and the persons holding the corresponding numbers were entitled to these prizes, or presents, according to their number.

But we can see nothing in the evidence from which it can be inferred that any one, present or absent, paid any valuable consideration, directly or indirectly, for these tickets, or for the chance of getting a prize. It is true that, on the day of the drawing, the defendant had held one of his customary performances, consisting of acrobatic contortions, exhibitions of magic-lantern, and of music, dancing and song, and the like; and between the acts he always sold his medicines, for which he claimed great curative virtues. These exhibitions were in a tent which would seat between 900 and 1000 people, and would furnish standing room for about 2,500 persons. For tickets of admission to see this performance—the closing one of the season advertised as a "Jubilee performance"—a charge of ten cents was made. But these tickets had no connection whatever with those entitling the holders to a chance for the eight prizes. For these latter tickets, or chances, nothing was charged. They had been distributed free, to any and all persons present at his previous performances, and for admission to these exhibitions no charge was made. The only fee charged was for the occupancy of a seat; there was none for entrance. Nor was it necessary that a holder of a successful ticket should be present to get his prize, in case he drew one. It would be delivered as well at the defendant's private house. This fact was advertised in a Mobile paper, and one of the prizes was actually delivered there. The suspicion, even though well founded, that these presents may have been given away in order to induce a large crowd to assemble at the defendant's performances, with the expectation that they would buy medicines, or pay a fee for occupying a seat in the tent, would be too remote to constitute a legal consideration for the tickets. So, with the expectation that it would increase the attendance at the so-called "Jubilee" performance. The holders of thousands of these tickets, given away as gratuitous, were not present, and yet stood an equal chance in the distribution as those who were. And the doors were thrown open for free admission when the distribution took place, this event occurring just after the close of the exhibition, or performance proper.

[Ward v. The State.]

The element of gaming, which is wanting to constitute this transaction a lottery, is the fact that no money was paid, directly or indirectly, for the chance of receiving a prize, or of participating in the distribution by lot. Nor would a jury be authorized to make a contrary inference reasonably from any evidence contained in the bill of exceptions.

Many rulings of the court are directly opposed to these views. It follows from what we have said that the City Court erred in not giving the general affirmative charge requested by the defendant.

The judgment of conviction is reversed, and a judgment will be rendered in this court discharging the defendant from further prosecution under the present indictment.

Reversed and rendered.