(8 Misc. Rep. 201.)

## IRVING v. BRITTON.

(Common Pleas of New York City and County, General Term.   May, 1894.)

1. CONSTITUTIONAL LAW—POOL SELLING ON HORSE RACES.
    The act, chapter 479, Laws 1887, commonly called the "Ives Pool Bill,"
    in so far as it purports to authorize pool selling at a horse race, is void for
    repugnancy to the prohibition of lotteries in section 10, art. 1, of the con-
    stitution of the state of New York.

2. LOTTERIES—POOLS ON HORSE RACES.
    A pool on a horse race is a lottery, within the interdict of the constitu-
    tion.

3. GAMING—BOOKMAKING.
    Bookmaking on a horse race is still illegal, by the provision of the Re-
    vised Statutes which makes unlawful all wagers, bets, or stakes on any
    race, or any unknown or contingent event whatever.

(Syllabus by the Court.)

Appeal from city court, general term.

Action by Robert G. Irving against Joseph A. Britton on a note
given for an interest in a pool, and for a bet with the bookmaker
at a horse race.   From a judgment of the city court affirming a
judgment in favor of plaintiff, defendant appeals.   Reversed.

Argued before DALY, C. J., and BISCHOFF and PRYOR, JJ.

Howe & Hummel, for appellant.

Leroy B. Crane and Edward V. B. Kissam, for respondent.

PRYOR, J.   The cause of action admitted by stipulation of the
parties is a transaction in pool selling and bookmaking on a horse
race, and, if such pool selling and bookmaking be illegal, the plain-
tiff is barred of recovery by the immemorial and salutary maxim
that "ex turpi causa non oritur actio."   Gray v. Hook, 4 N. Y. 449,
455; Hull v. Ruggles, 56 N. Y. 424.   By sections 351 and 352 of the
Penal Code, pool selling and bookmaking on a horse race are de-
nounced as crimes, and punished by fine and imprisonment.   But
plaintiff contends that the pool selling and bookmaking exhibited
in the case are authorized by the act of 1887, commonly called the
"Ives Pool Bill;" and, if so, then, beyond question, the action is
well brought.   That the effect of the Ives bill, if a valid enactment,
is to legalize such pool selling, is inevitable upon the provisions of
the statute, and is settled by authoritative adjudication.   Brennan
v. Association, 56 Hun, 188, 9 N. Y. Supp. 220;  Bish. Writ. Law, §
104a.   Conceding so much, the defendant answers that the Ives
bill is a nullity, because repugnant to section 10, art. 1, of the consti-
tution, which says:   "Nor shall any lottery hereafter be authorized
or any sale of lottery tickets allowed within this state."   Whether,
within the meaning of this prohibition, pool selling and bookmaking
on horse races be lotteries, is the precise point for adjudication.

By incorporating the interdict of lotteries in the constitution, and
associating it with the fundamental guaranties of life, liberty, and
property, the people of New York signalize by the most emphatic
manifestation their sense of the enormity of the evil they so seek
to suppress.   That evil consists in the temptation and facilities

afforded by the lottery for the indulgence of the passion of gambling, —an indulgence, by all experience, as inimical to the well-being of the state as of the individual. Gambling is the mischief against which the prohibition of the constitution is leveled; and it is "the office of the judge to make such construction as will suppress the mischief, and advance the remedy, and to suppress all evasions for the continuance of the mischief." Magdalen College Case, 11 Coke, 66b–79a; Wilkinson v. Gill, 74 N. Y. 63, 67. The language of the constitution is generic, not specific; not one species of lottery, but all lotteries, are proscribed. What, then, in the sense of this provision of the fundamental law, is a lottery? In the jurisprudence of New York, at least, the import of the term is not open to doubt or dispute, for its definition is established as well by legislation as by the adjudication of the courts. "A lottery is a scheme for the distribution of property by chance among persons who have paid or agreed to pay a valuable consideration for the chance, whether called a lottery, raffle or gift enterprise, or by some other name." Pen. Code, § 323; People v. Noelke, 94 N. Y. 137. "Where a pecuniary consideration is paid, and it is to be determined by lot or chance, according to some scheme held out to the public, what and how much he who pays the money is to receive for it,—that is a lottery." Hull v. Ruggles, 56 N. Y. 424; Kohn v. Koehler, 96 N. Y. 367. Accordingly, in Governors of Alms House v. American Art Union, 7 N. Y. 228, it was adjudged that "an annual distribution by lot among the members of an art union of works of art purchased by their subscriptions is a lottery, within the meaning of the constitution." In Hull v. Ruggles, supra, it was so held of a scheme for selling packages of candy, in some of which were tickets entitling to a prize and in others not. So, in Negley v. Devlin, 12 Abb. Pr. (N. S.) 210, of a ticket entitling to admission to a concert, "and to whatever gift might be awarded to its number." So, in Wilkinson v. Gill, 74 N. Y. 63, of "any game or device of chance in the nature of a lottery," the chief judge saying that "the courts have uniformly looked beyond the mere form of the transaction, and sought out and suppressed the substance itself." Equally illustrative of the principle of a lottery are the cases wherein the transaction was adjudged not to be a lottery. Thus, in People v. Gillson, 109 N. Y. 389, 402, 17 N. E. 343, the scheme was held to be no lottery, because not involving "the slightest element of chance." Similarly, in Kohn v. Koehler, 96 N. Y. 362, 368, the scheme was declared not a lottery, because the property "was not raffled for or distributed by lot or chance." From all the cases these are collected as the constituent elements of a lottery, namely: First, an expedient held out to the public; which, secondly, for a pecuniary consideration, offers the possibility and promise of a gain, not the product of the outlay, but contingent merely upon a designated chance event. As the name imports, the lot or chance is the essential property of the unlawful enterprise, and the allurement to the public the incident that aggravates its mischievous quality. Being a species of gambling, so extensive in its influence, and so fatal in

its effect, the people, by provision in the organic law of the government, forbid its presence or operation within the limits of the state.

The method of pool selling found by the trial court is as follows:

"A list of horses, as competitors in each of the said races, was placed on an indicator in open view, and to each horse was attached a number, a clear space being reserved for the name of each horse, with a separate dial attached, which showed the number of times the horse had been chosen; and the defendant, for the purpose of investing money on certain horses in said races, purchased a card or receipt, commonly called a 'ticket,' stating at the time the horse upon which he purchased the card or ticket, which ticket had on its face a number which corresponded to the number attached to the name of the horse on the indicator, the number being used merely to facilitate business, and having no other significance. When the purchase had been made, the pool indicated the whole number of cards, receipts, or tickets sold or taken, shown upon an indicator placed in the open view, and which was done from time to time as each card, receipt or ticket was purchased or taken. When the pool was closed, the total amount invested on the different horses, or the amount of the different cards or tickets purchased or taken on the different horses, was added together and shown on a different dial, in the open view, called the 'total,' and the total constituted the pool. The total, less the commission of the person conducting the pool, was divided in equal sums, and was paid to the persons having selected cards, tickets, or receipts on the winning horse, upon presentation of their cards, tickets, or receipts. Any number of persons, acting separately, could choose any horse in the race, and the number of cards, tickets, or receipts sold or taken on each horse was unlimited. Any person could buy or take as many cards, receipts, or tickets on each horse, or upon as many horses, in the race as he chose."

Tested by either criterion, whether by the definition of the courts or of the statute, the process set forth is in every essential a lottery. By it, "for a pecuniary consideration, is determined by lot or chance, according to a scheme held out to the public, what and how much he who pays the money is to have for it." Hull v. Ruggles, 56 N. Y. 427. And it is "a scheme for the distribution of property by chance among persons who have paid or agreed to pay a valuable consideration for the chance." Pen. Code, § 323. That the event of a race is a contingency dependent upon chance is a self-evident proposition. 1 Edmonds' St. at Large, 614, § 8. Indeed, were the result susceptible of infallible anticipation, betting on a horse race would be as senseless and futile as upon the rising of the sun or the succession of the seasons. It is the element of chance, and the uncertainty of the event alone, that stimulate and support the wagers of the competing bettors. True, fraud may make the result a foregone conclusion; but then fraud is a circumstance in the calculation of chances by those not in the swindle, and fraud of itself would expose the transaction, though legal, to the condemnation of the law.

The decision of the learned trial judge upon the legality of pool selling appears to have been affected by the impression that the Ives bill determines it to be "in the line of public welfare." And yet that very act denounces pool selling at any other place or time than on a race course and race day as a felony, and punishes it by confinement in the state prison. How the same thing can be a legal and laudable pastime at Sheepshead on a race day, and still be an infamous offense at all other times and at all other places, we own our inability to understand. The legislature may be criticised for inconsistency, but is not amenable to the malediction imprecated

upon "them that call evil good." Not by principle only, but by authority as well, we are sustained in the conclusion that pool selling is a lottery. In State v. Lovell, 39 N. J. Law, 458, the point was expressly adjudicated by a tribunal eminent for learning and ability; and at a special term of our own supreme court the same result was reached by Mr. Justice McLennan in an argument of convincing cogency. Reilly v. Gray, unreported. See McLanahan v. Mott, 73 Hun, 131, 25 N. Y. Supp. 892; Horner v. U. S., 147 U. S. 449, 13 Sup. Ct. 409; U. S. v. Ziesler, 30 Fed. 499; State v. Clarke, 33 N. H. 329; Tollett v. Thomas, L. R. 6 Q. B. 514; U. S. v. Wallis, 58 Fed. 942. In Brennan v. Association, supra, the constitutionality of the Ives bill was not suggested for discussion or decision, and hence the case is not to be accepted as implying a recognition of the validity of the statute. The conclusion is that the statute (chapter 479, Laws 1887), in so far as it purports to authorize pool selling, is repugnant to the prohibition of lotteries in section 10, art. 1, of the constitution, and is void and of no effect.

Whether the act be equally inoperative to legalize bookmaking is a question presented and argued by counsel, but which requires no decision; since, in any event, the judgment must be reversed. The consideration for the note in suit was partly an interest in the pool and partly a bet with a bookmaker, but how much of either is not apparent. The case, then, is of a contract avoided by partial illegality in an entire and indivisible consideration. Bank v. King, 44 N. Y. 87. We should not forbear to remark, however, that, as the act of 1887 does not purport to validate bookmaking, but only exempts it from the operation of sections 351, 352 of the Penal Code, the illegality of it is obvious and inevitable from the provisions of the Revised Statutes against betting and gaming. 1 Edmonds' St. at Large, 614, § 8. The specific criminality of the transaction may be effaced, but it remains unlawful; and all contracts implicated with it are void by the express terms of the statute. Judgment reversed, and judgment directed for the defendant, dismissing the complaint upon the merits, with the costs of this appeal and of the court below.

DALY, C. J., concurs.

BISCHOFF, J. (concurring in result). Were I agreed with my brethren that the so-called "Ives Pool Law" (chapter 479, Laws 1887) purports to legalize pool selling, I should unhesitatingly concur that the act contravenes the constitutional interdiction of the authorization of lotteries by the legislature of this state (Const. 1821, art. 7, § 11; Const. 1846, art. 1, § 10). That a pool upon the result of a horse race is a lottery is apparent from the fact that it is but one of many devices for the venturing or hazarding of a smaller sum for the chance of obtaining a greater; and that such a pool is a lottery was judicially determined in State v. Lovell, 39 N. J. Law, 458. See, also, as to what constitutes a lottery, note in 16 Am. St. Rep. 42 [Yellow-Stone Kit v. State (Ala.) 7 South. 338], containing an elaborate review of adjudged cases. I am, however, of the opin-

ion that an intention to legalize pool selling is not the inevitable effect of the act in question. Nevertheless I concur that the judgment appealed from must be reversed because the act provides no justification therefor.

The facts in this case are all admitted, and it is with the conclusions of law that we are concerned. These facts are substantially that the consideration for the note in suit rested upon the result of gaming transactions,—pools formed as a method for betting upon the results of horse races; that the races were held under the auspices of a duly-incorporated association for improving the breed of horses, and were run upon days legalized for such purposes by the act alluded to; that these pools were formed at such times and at the places where the races took place; in fact that the transactions in question came within the provisions of the act in its essential particulars. The sole question presented is whether, in view of these facts, payment of the note in suit may or may not be enforced in law. The Ives pool law (chapter 479, Laws 1887, § 4) provides that races may be conducted upon any race track of an incorporated association for not more than 30 days in each year; that sections 351 and 352 of the Penal Code shall not apply to such tracks during the number of days during which races are permitted; that racing and pool selling shall be confined to the tracks where the races take place, and the days of such races. The effect, however, of these provisions, is merely to remove the penal inhibition against the public placing and recording of bets, as contained in sections 351 and 352 of the Penal Code, under certain conditions and restrictions. The act, in effect, declares that the sections of the Penal Code shall not be operative where compliance with the prescribed conditions shall exist; and the regulation as to the time and place for the selling of pools is obviously but one of the restrictions in contemplation of which the operation of the penal laws is suspended. The result is precisely the same as if the sections of the Penal Code referred to had originally exempted pool selling at the times and places mentioned in the Ives pool law from their operation. So far only do the provisions of the Ives pool law extend, and in no way do they affect the civil aspect of the gaming contract thus entered into. By the organic law, as well as by express statutory enactment, the contract is civilly void and unenforceable. 3 Rev. St. (Banks Bros. 7th Ed.) p. 1962, § 8, art. 3, tit. 8, c. 20. The facts that provision for the infliction of punishment for the making of the contract is omitted, or that by force of some special statute the contract may be made with penal impunity, do not alter the rule. Gibbons v. Gouverneur, 1 Denio, 170; Ruckman v. Pitcher, 1 N. Y. 392. That a common-law or statutory right or offense, when subsequently made the subject of penal enforcement or restraint, is not affected by the punitory enactment, in the absence of a clear intent, is a well-settled proposition. Renwick v. Morris, 3 Hill, 621; Tremain v. Richardson, 68 N. Y. 617; Candee v. Hayward, 37 N. Y. 653; Colden v. Eldred, 15 Johns. 220; Platt v. Sherry, 7 Wend. 238; Scidmore v. Smith, 13 Johns. 322. In such a case the subsequent regulation is cumulative upon prior remedy, and the repeal or suspension of the cumulative provision is of no more effect than was its

enactment. Familiar analogies to the principle governing this case are too numerous to call for mention. The "debt of honor" of popular acceptance does not derive its quality from a criminal inception of the obligation, but from the civil impossibility of its enforcement. The card player may not infringe a penal law in his successful prosecution of a fair game, but with his recovery of the stakes the courts will not be concerned. To hold that the Ives pool law, by the force of its provisions regulating the time and place for the selling of pools on horse races, purported to legalize contract obligations arising from the sales, would entail an unauthorized application of the rules governing statutory construction. This would intend, so far, a repeal by implication of the provisions of the Revised Statutes relating to gaming contracts, and such implication must, therefore, be unavoidable, in order that it may obtain. Hankins v. Mayor, etc., 64 N. Y. 18; Mark v. State, 97 N. Y. 578; People v. Palmer, 52 N. Y. 83; People v. Mallory, 2 Thomp. & C. 76. An implied repeal only then results when the necessary operation of the later enactment cannot be harmonized with the terms and effect of an earlier act, and extends only to the repugnance. Suth. St. Const. § 138. The Ives pool law relates, as above shown, to the penal aspect of the acts in question, and the repeal of the statute which takes away the civil remedies for the enforcement of a gaming debt would be an unauthorized, rather than a necessary result in solving its meaning. In re Curser, 89 N. Y. 401. Upon a reasonable construction, therefore, both these statutes may be given their proper effect, and inharmony in no way results. People v. Palmer, supra; People v. Crissey, 91 N. Y. 616. The case of Brennan v. Association, 56 Hun, 188, 9 N. Y. Supp. 220, has not been overlooked, but I am unable to follow the ruling there made, after careful consideration, such as the high character of the court announcing the decision calls for.

With reference to any contention that the Ives pool law is in contravention of the constitutional interdiction of the authorization by the legislature of lotteries or the sale of lottery tickets, it is to be observed that every presumption is in favor of the constitutionality of legislative enactments, and every act of the legislature is to be sustained, rather than defeated, unless the language employed plainly precludes every reasonable construction other than that it was intended by the act to infract the organic law. People v. Briggs, 50 N. Y. 553. It is not the province of the courts to nullify the legislative will only because a particular law may be of vicious tendencies, while every constitutional provision remains inviolate. Whether a particular measure is wise or unwise it is the peculiar province of the legislature to decide. If, therefore, the constitutionality of any act is to be successfully challenged, not only must the provisions of the act be in apparent conflict with some constitutional provision which restricts or prohibits the exercise of legislative authority in the particular case (People v. Comstock, 78 N. Y. 356), but every reasonable construction, also, of which the language of the act is susceptible, must lead to the same end (Suth. St. Const. § 331; Sweet v. City of Syracuse, 129 N. Y. 316, 27 N. E. 1081, and 29 N. E. 289). Hence, if the language is susceptible of two construc-

tions, alike reasonable, though conflicting, that construction is to be preferred which will give effect to the act though the other may at first view appear to be a more natural interpretation of the language. Suth. St. Const. § 332. Applying these canons of construction to the Ives pool law, I am of the opinion that it was the intention of the legislature to withdraw existing penal provisions so far as they might apply to pool selling at the times and places specified in the act, and not to legalize such sales. The act, in my opinion, tolerated, but did not authorize, pool selling. The constitutional interdiction against lotteries and the sale of lottery tickets does not require the legislature to prescribe punitory redress for the conduct of lotteries or sale of lottery tickets. The matter, therefore, rested in legislative discretion. The suspension or repeal or partial repeal, therefore, of existing penal provisions did not contravene any provision of the constitution, while the suspension or repeal and the remaining penal provisions were generally applicable to every part of the state. My conclusion is that, upon the admitted facts, the recovery below was unauthorized, and that the judgments of the general and trial terms of the court below should be reversed, and judgment directed for the defendant for dismissal of the complaint upon the merits, with the costs of this appeal and of the court below.