Order to be settled on notice.

---

(4 App. Div. 82.)

### PEOPLE ex rel. LAWRENCE v. FALLON, Warden.

(Supreme Court, Appellate Division, First Department.  April 17, 1896.)

1. LOTTERIES—HORSE RACES—PURSE FOR WINNER.
    A racing association permitted owners of horses of a certain age to compete for a purse of a certain amount, to be furnished by the association. Each person who entered a horse for the race was required to pay a sum known as "entrance money," which became the property of the association and paid into the general treasury.  The purse to be paid to the winner was contributed by the association without reference to the amount of entrance money  *Held*, that such transaction was not contriving a lottery, within the prohibition of Pen. Code, § 323.

2. HORSE RACING—BOOKMAKING AND POOL SELLING.
    Nor was it pool selling or bookmaking, within the prohibition of Pen. Code, § 351.

3. SAME—RUNNING FOR PURSE NOT GAMBLING.
    Running a horse for a purse to be contributed by the association on whose tracks the race is run is not gambling.

Appeal from court of oyer and terminer, New York county.

Samuel B. Lawrence was arrested on separate charges for violating Pen. Code, §§ 323, 351, 352, and was committed to the city prison, to await the action of the grand jury.  From an order discharging him from imprisonment, John Fallon, the prison warden, appeals.  Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, and O'BRIEN, JJ.

John D. Lindsay, Noah Davis, and Benjamin Steinhardt, for appellant.

Elihu Root, J. S. Auerbach, and Delancey Nicoll, for respondent.

RUMSEY, J.  The relator was arrested upon three separate charges:  The first, of the violation of section 323 of the Penal Code; the second, of the violation of section 351; and the third, of the vio-

lation of section 352 of the same law. Upon being arraigned before the magistrate upon the charges against him, he waived examination, and was committed to the city prison, to await the action of the grand jury upon the presentment for the crime of which he was accused. He then sued out this writ of habeas corpus, claiming that, upon the facts as they existed and as they are conceded to be in the case, he was not guilty of any crime. Upon the return of the writ of habeas corpus, a writ of certiorari was granted, and all the papers upon which the warrants against the relator had been issued were returned to the court of oyer and terminer by the committing magistrate, and thereupon, after a hearing, the relator was discharged. From the order discharging him, this appeal is taken.

The facts which are alleged to constitute the crime by virtue of which the relator was arrested are not in dispute. They are, substantially, that the relator and others are officers of an association called the Westchester Racing Association, which, it is conceded, is organized pursuant to the provisions of chapter 570 of the Laws of 1895. It is stated in the information and the accompanying affidavits that these officials had announced their intention and that of the association to hold a public race meeting, at which certain races were to take place. In one of these, known as the "Withers' Stakes," the owners of all horses of a certain age were permitted to compete for a purse of $3,500 to be furnished by the association, of which the winning horse received a certain proportion, and the second and third horses a smaller sum. Any owner of horses of the proper age could enter his horse for such race, paying to the association a sum of money, known as "entrance money." This money, when paid to the association, became the absolute property of the association, and the premium or prize which was to be paid to the winner was contributed by the association, and amounted to a certain sum, without regard to the number of horses which entered for the race or to the amount of the entrance fees. The entrance fees which were contributed by the horse owners who intended to participate in the races were paid into the general treasury of the association, and became a part of its general assets, and the association assumed an absolute obligation to pay out of its general funds the amount of $3,500, to be divided between the first, second, and third horses in the race. The race was to be conducted in the usual way, and under the rules which were prescribed by racing associations. It was conceded that the race did take place under the direction of the relator and others, as officers of the Westchester Racing Association. Upon this state of facts, it is insisted by the people that the relator is guilty of the several crimes described in the three different warrants upon which he was arrested, or of one of them.

If, by the first warrant, which accuses the relator of a violation of section 323 of the Penal Code, it was intended to charge that, by taking part in establishing this race, he was guilty of contriving, or assisting in contriving, a lottery, within section 323 of the Penal Code and subsequent sections, that contention clearly cannot be maintained. A "lottery" is defined by the Penal Code to be a

scheme for the distribution of property by chance among persons who have paid or agreed to pay a valuable compensation for the chance. The essential quality of a lottery is that the distribution of the prize shall depend entirely upon chance, and that so far as possible, if the lottery is honestly conducted, no other element whatever shall enter into it. There certainly is a wide distinction between the wager of money upon the result of any game and the purchase of shares in a lottery. To a certain extent, it may be said that what is called "chance" enters into the result of any game, even the game of chess, and that nothing which is the result of a contest or competition is decided without some other element entering into it than the mere skill of the persons who take part in the contest. Everybody recognizes that in a baseball game or a game of football, or in running or walking matches, the result depends, not alone upon the skill and strength and agility of the competitors, but upon numerous incidents which may or may not occur, and whose occurrence depends upon something which nobody can predict, and which, so far as human knowledge is concerned, have no reason for existing. This is a chance, pure and simple; but yet the result of those games cannot in any just sense be said to be a lottery. The distinction we apprehend to be that, in a lottery, no other element is intended to enter into the distribution than pure chance; while, in the result of other contests which are forbidden under the act against betting or gaming, other elements enter, and the element of chance, although necessarily taken into consideration, may be and is eliminated to a very considerable extent by by the skill, careful preparation, and foresight of the competitors. It is quite clear that the law has always recognized the distinction between betting upon horse races and the establishment of lotteries. Horse racing was forbidden by law as early as 1802. 1 Rev. Laws, p. 222. The same statute forbids raffling, but a subsequent statute in the same book regulated lotteries to the extent even of requiring managers to take an oath to faithfully perform the duties which devolved upon them in that capacity. Id. p. 270. When the Revised Statutes were adopted, all these laws were rearranged, and the statute against betting and gaming was put by itself; that against lotteries was entirely a different statute; and following that was an article regulating the racing of animals. So that it was quite clear that at that time the lawmakers did not regard the crimes as identical, but understood that they were different crimes, and required different definitions and treatment. The same state of affairs is to be found in the Penal Code, which recognizes the distinction which has always existed between bets and wagers upon any game of skill or chance and the establishing of lotteries or the selling of lottery tickets. It is quite clear that the lawmakers have always had in mind the distinction between lotteries and running horses for stakes. This distinction has been established by the courts. Reilly v. Gray, 77 Hun, 402, 28 N. Y. Supp. 811. We do not mean to say that it may not be practicable to so plan a device to distribute money by means of some chance in which the result of a horse race may be an element, that the

scheme may be obnoxious to the prohibition of the statute regarding lotteries, as was held in the case of Irving v. Britton, 8 Misc. Rep. 201, 28 N. Y. Supp. 529. All that we decide now is that, upon the facts shown in this case, the defendant cannot be said to have been guilty of any of the acts which are forbidden by those sections of the Penal Code prohibiting lotteries.

Neither is he guilty of poolselling or bookmaking, within section 351 of the Penal Code. The only thing of which he can be guilty under the facts is aiding and abetting racing of horses for a stake or wager or reward, as forbidden by sections 351 and 352 of that law.

The people claim that the acts which it is conceded that he did constitute a violation of section 352 of the Penal Code, because they say that he aided in racing horses for a bet, stake, or reward. This the defendant concedes; but he says that he is relieved from any criminal penalty under that section, because the thing he did was expressly allowed by special law, to wit, chapter 570 of the Laws of 1895. To this the people reply that that portion of chapter 570 of the Laws of 1895, so far as it permits the running of horses for a premium or prize, is within the prohibition of section 9 of article 1 of the constitution, and therefore, being void on that account, it is no protection to the relator. It will be seen, therefore, that the sole question presented is whether that portion of the law of 1895 which permits, upon the tracks of the racing organizations organized pursuant to it, the running of horses for a purse, prize, or premium contributed by the association, is obnoxious to the section of the constitution above mentioned. That section prescribed that no lottery, poolselling, bookmaking, or any other kind of gambling shall hereafter be authorized or allowed within this state, and the question to be decided is whether the act which has been done by the defendant comes within the prohibited acts. The law of 1895 clearly legalizes the running of horses for purses which are contribtuted by the association upon whose tracks the race is to take place, but which are not contributed by the persons who participate in the race. If that is gambling, then the law is obnoxious to the provisions of the constitution, and cannot be sustained, and it does not protect the relator. The convention, in framing the constitution, and the people, in adopting it, must be assumed to have had in mind in the use of its terms the meaning which had been given to those terms before they were inserted in the constitution, if such meaning was well recognized and understood at that time; and, when the article was adopted which forbade any kind of gambling, it must, of course, be construed to include those things which had usually been understood to be gambling, or things of the like nature, and not include anything which at that time, within the well-established rule of law, was not gambling.

It must be remembered that the constitution did not establish any new rule in this state. All gambling and betting and wagering had been forbidden for many years by statute. The only effect of the constitution was to put it out of the power of the legislature to authorize any kind of gambling by the repeal of the laws which had

theretofore forbidden it. For many years the law had forbidden bets and wagers upon horse races, as well as racing for a reward; but it is to be noticed that each of those laws since 1830 has contained a provision excepting such racing as was allowed by special statute, and, wherever such an exception was inserted in the law, racing for a reward or premium had been held to be valid, and not to be gambling. The evil at which the makers of the constitution intended to strike was well known. So far as it existed at the time the constitution was adopted, it especially consisted in what was known as "poolselling" and "bookmaking"; and the prohibition against any other kind of gambling was inserted, not for the purpose of including acts which had not been understood to be gambling, but for the purpose of precluding any change in the manner of doing the particular acts which were within the objection, so that it could be said that they were not within the prohibition of the constitution. But it is quite clear, however broad may have been the words of the constitution, that the legislature did not intend, by the use of the word "gambling," to bring anything within the meaning of that word which was not gambling before the constitution was adopted. At the time of the adoption of the constitution, and for many years before, it had been held that the racing of horses for purses, prizes, or premiums which were not contributed by the owners or drivers of the horses was not a race for a bet or stake, so that it was illegal, under the prohibition of the Revised Statutes. 1 Rev. St. p. 672, § 55; Harris v. White, 81 N. Y. 532. The court expressly held in that case that there is a distinction between the words "bet" or "wager" and that which is conveyed by the term "purses," "prizes," and "premiums." As is said, a bet or wager is ordinarily an agreement between two or more that a sum of money, in contributing which all agreeing take part, shall become the property of one of them on the happening in the future of an event at present uncertain. There is in them an element which does not enter into the purse, prize, or premium, namely, that each party to the bet gets a chance of gain from the others, and takes a risk of loss of his own to them. One or the other thing must necessarily occur. A prize or premium is ordinarily something offered by a person for the doing of something by others in a contest in which he himself does not enter. He has not a chance of gaining the thing offered, and, if he abides by his offer, he must lose it, and give it to some one of those who contest for it. In a wager or bet there must be two parties, and it is known before the happening of the event that one of them must lose or win. In the giving of a premium there is but one party who can lose, and those who enter into the contest cannot by any possibility lose, although one of them may win. A premium is a reward or recompense for some act which is done. A wager is a stake upon a certain event. The distinction between them is clear, and it has been adopted, so far as we can discover, in every case in which the question has been raised in this country. Alvord v. Smith, 63 Ind. 58; Porter v. Day, 71 Wis. 296, 37 N. W. 259; Delier v. Agricultural Soc., 57 Iowa, 481, 10 N. W. 872. See, also, Costello

v. Curtis, 13 Wkly. Dig. 20. No one would dream that the offering of a premium upon the result of a rowing match or for a contest in oratory, was "gambling," within the plain meaning of the words as they had been understood before the passage of the constitutional amendments. Neither was it ever suggested that the numerous prizes which are offered for excellence in draft horses or saddle horses, or for one who turns the best furrow, are obnoxious to the prohibition of the constitution; and yet these offers stand upon precisely the same footing, and are within the same principle, as the offer of the premium or prize to be competed for by the racing of animals. The fact that the owner of each horse who proposes to compete in the race is required to pay an entrance fee does not make the transaction a bet or a gambling transaction. The money is paid for the privilege. When paid, it becomes the absolute property of the association. The person paying it under no circumstances can have it again, and whether he wins or loses, or, indeed, whether his horse competes or not, is a matter of no importance, for in no event is the money to be returned to him. He simply pays a certain sum for the privilege of competing, and that sum so paid is not to be returned to him in any event, and he has no claim upon it after it once becomes the property of the association. At the time of the adoption of this amendment, the law was settled as we have seen, and the thing which the defendant is accused of doing, and which he did do, had been determined not to be gambling and obnoxious to the statutes which then existed upon that subject. Nothing has since occurred to extend the meaning of the term as then used. No extension of the meaning is necessary to meet and overcome the evil which the constitution makers and the people had in mind in the adoption of this amendment.

We are not inclined to limit unduly the meaning of this provision of the constitution, which we regard as highly beneficial, and which was undoubtedly greatly needed; neither ought we to do so; but, in construing it, we must adopt the meaning of terms as they had been understood to exist, and should give to the words used in it their ordinary and usual significance, no more and no less. Thus construing these words, we are quite clear that they do not forbid the act of which the relator here was accused, and that so much of chapter 570 of the Laws of 1895 as gives to corporations organized under section 3 the right to have race meetings, and to contribute purses, prizes, or premiums to be contested for at those races by the owners of horses, is constitutional. As the acts of the relator are authorized by this law, he is protected by it, and he was not guilty of any violation of section 352 of the Penal Code, because that statute expressly excludes from its prohibition racing for a reward when it is allowed by special act. Therefore, the order discharging the relator was not erroneous, and must be affirmed.

Order affirmed, with costs. All concur.