THE CHANCY PARK LAND COMPANY v. B. B. HART, Appellant.

Contracts: LOTTERIES. That the subscribers for lots, which were to be divided or apportioned among them in such manner as they should decide, made the apportionment by drawing lots, does not prevent the promoters, who did not participate in or suggest the manner of the apportionment, from enforcing the contract entered into by a subscriber, for the lot drawn by him.

RULE APPLIED. Certain lots contracted for by the promoter of a packing house plant, were subscribed for under an agreement to take the number set opposite the name of each subscriber, if the packing house was secured. The lots were to be apportioned in such manner (as subscribers) may decide. At a meeting called by the promoters to divide the lots by "method * * * to be decided upon by a vote of the subscribers," the plan of one of the promoters was adopted; the other promoters taking no actual part, and all having announced that they left the method of the apportionment to the subscribers The subscribers' names were drawn out of one box, and the numbers of the lots to correspond were drawn out of the other, by two of the subscribers agreed upon. None of the lots were worth more than the price paid. *Held*, that the apportionment of the lots was by the subscribers alone, and the method was not a lottery, within the meaning of Code 1873, section 4043, constitution, article 3, section 28, prohibiting lotteries.

*Appeal from Clinton District Court.* — HON. P. B. WOLFE, Judge.

MONDAY, JANUARY 31, 1898.

ACTION to foreclose a contract for the sale of a city lot. Decree as prayed, and defendant appeals.— *Affirmed.*

*Frank W. Ellis* and *L. A. Ellis* for appellant.

*A. P. Barker* for appellee.

LADD, J.—In the early part of 1892, W. H. Pearce, J. H. Dunham, and A. P. Barker engaged in the enterprise of inducing the Iowa Packing Company to erect a pork-packing and beef-killing plant at Clinton, Iowa, and in order to obtain a site therefor, and to pay a bonus, entered into a contract with C. H. and Mary M. Aller and Lura M. Hall for the purchase of ninety-six acres of land, with the condition that the grantors should plat the west sixty acres into lots and streets, and execute an agreement for the conveyance of lots therein, at the price of three hundred dollars each, to purchasers, as directed by the grantees, in the event that two hundred and twenty-five were sold. These agreements, or contracts, were to be held as security for the payment of the consideration. The grantors agreed to take sixteen lots at the price named, and indorse the amount upon the contract of sale, and, when two hundred and twenty-five lots were sold, to convey to the promoters the east thirty-six acres, and, upon the payment of the entire balance, to assign all contracts, and deed all unconveyed lots, to the said promoters, Pearce, Dunham, and Barker. Subscribers for the purchase of 211 lots were procured, on the condition that "the undersigned, in consideration of the securing of such plant, and the agreements of others whose names are subscribed hereto, agree to take the number of lots in such proposed sub-division set opposite our names; * * * said lots to be divided or apportioned among the subscribers hereto in such manner as they may decide; each subscriber to have one vote for each lot purchased by him; and this agreement not to be binding unless a contract is closed with said Iowa Packing Company for the

erection of said plant substantially in accordance with the terms of said written proposition." A meeting of the subscribers was called by the promoters, for the purpose of dividing or apportioning among them the lots; and it was stated in the notice that, "according to the terms of subscription, the method of division of said lots will be decided upon by vote of subscribers." Barker called the meeting to order, and stated its object. Thereupon a president and secretary were selected. Methods of apportioning the lots were discussed generally, but finally that suggested by Barker was adopted. Dunham answered a few questions asked by persons present, and Pearce said nothing. It was announced, however, that the promoters wanted nothing to do with the meeting, and left it entirely in the hands of the subscribers; and the evidence warrants the conclusion that the method of apportioning the lots, and the apportionment thereof, were determined upon and carried out by the subscribers alone. A drawing committee was selected, and the names of all subscribers placed in a box, and the number of the lots, with the blocks, put into another. The two oldest men present were then required to lay aside their spectacles, that they might not see, and one drew names, and the other the lots to correspond. The result was kept by the secretary, and a contract of sale executed by the Allers and Hall accordingly. The lots varied in value, though none appear to have been worth more than the price paid. The defendant was so unfortunate as to secure one with a ravine passing through it. He paid the first installment of one hundred dollars, and, failing to pay the remaining two hundred dollars, this action was brought to foreclose the contract. The defenses interposed are that the methods employed in distributing the lots constituted a lottery, and that the contract was obtained by fraud.

I.    It is conceded that the defendant's contract for
the purchase of the lot, if in pursuance of, or in promo-
tion of, a lottery scheme, is against public policy, and
cannot be enforced. *Guenther v. Dewien*, 11 Iowa, 133;
*Seidenbender v. Charles*, 8 Am. Dec. 682, and notes; 13
Am. & Eng. Enc. Law, 1187. For, if a transaction is
prohibited by the statute, a contract based thereon is
void. It is important, then, to determine what is a lot-
tery, such as is prohibited by the statute and constitu-
tion.    Section 28, article 3, Constitution Iowa; Code,
1873, section 4043. The word has not acquired a tech-
nical or legal significance differing from that of
approved usage in the language. The lexicographers
are agreed that a distribution of prizes by lot or chance
may constitute a lottery. Worcester and the American
Cyclopedia include payment of a consideration for the
chance, while nearly all refer to it as a scheme. See
*U. S. v. Olney*, 1 Deady, 461. To bring the transaction
within the meaning of the statute prohibiting lotteries,
something of value must be parted with, directly or
indirectly, by him who has the chance. *Yellowstone
Kit v. State*, 88 Ala. 196 (7 South. Rep. 338; 16 Ann. St.
Rep. 38, and extended note); *Cross v. People*, 18 Colo.
321 (32 Pac. Rep. 821). The authorities uniformly refer
to a lottery as a scheme. Bishop defines it as "a scheme
by which, on one's paying money, or some other thing
of value, he obtains the contingent right to have some-
thing of greater value, if an appeal to chance, by lot
or otherwise, under the direction of the manager of the
scheme, should decide in his favor." Bishop, Statutory
Crimes, section 952.    The accepted definition of the
court of appeals of New York is found in *Hull v.
Ruggles*, 56 N. Y. 424, approved in *Wilkinson v. Gill*,
74 N. Y. 63 (30 Am. Rep. 264): "Where a pecuniary con-
sideration is paid, and it is to be determined by lot or
chance, according to some scheme held out to the public,
what and how much he who pays the money is to receive

for it, that is a lottery." In *Rothrock v. Perkinson*, 61 Ind. 39, the court says: "It is well settled in this state that every scheme for the division or disposition of property or money by chance, or any game of hazard, is prohibited by law, and that every contract or agreement in aid of such a scheme is void." The supreme court of Michigan defines a lottery as a "scheme by which a result is reached by some action or means taken, and in which the result of man's choice or will has no part, nor can human reason, foresight, sagacity, or design enable him to know or determine such results until the same has been accomplished." *People v. Elliott*, 74 Mich. 264 (16 Am. St. 644). So, in *State v. Clarke*, 33 N. H. 329 (66 Am. Dec. 723): "Where a pecuniary condition is paid, and it is determined by lot or chance, according to some scheme held out to the public, what the party who pays the money is to have for it, or whether he is to have anything, it is a lottery, within the meaning of the statute." See, also, *Lynch v. Rosenthal*, 144 Ind. Sup. 86 (42 N. E. Rep. 1103); 13 Am. & Eng. Enc. Law, 1164. It thus appears that there must be some plan or scheme, on the part of the promoters of the enterprise alleged to be unlawful, for the sale or disposition of property by lot or chance, before it can be said to have the character of a lottery. If the sale is without the purpose that the property, or any part of it, shall be obtained by the purchaser through chance, and this does not result from the nature of the transaction, then it is not so tainted. The sale of the lots to the subscribers in this case was not in pursuance of any design to promote a lottery, or in evasion of the law. Each subscriber contracted,—as he had the right to do,—for the purchase of one or more of the lots, with the understanding that they should be apportioned as the subscribers themselves might determine. Having agreed to buy before the land was platted,—induced by a desire to aid an enterprise of anticipated advantage to the

city,—they concluded, after much discussion, and the proposal of other plans, to make the selection by drawing the number of a lot and name from different boxes, at the same time. We know of no good reason why these purchasers did not have the right to divide their property or that contracted for, according to their own notions and agreement. We have discovered no authority denying them that right, but, on the contrary, it is recognized in *Commonwealth v. Manderfield,* 8 Phila. 457; 2 Wharton, Criminal Law, section 1891; *Yellowstone Kit v. State, supra.* Joshua so apportioned the promised land among seven tribes of the children of Israel. The disciples of Christ chose Matthias to succeed Judas by casting lots. Under the laws of this state, the right to an office is determined, when there is a tie vote, by the same method. Code, section 1169. There was nothing in the transaction opposed to good morals, and it was not a lottery, within the meaning of the law. Without a scheme or plan to distribute by chance, on the part of the promoters, the vital part of a lottery was lacking. The evidence fails to show that any fraud was practiced as to this defendant. The judgment and decree of the district court is AFFIRMED.