## McCleary v. Chipman et al..

[No. 4,791.   Filed October 15, 1903.   Rehearing denied January 5, 1904.   Transfer denied February 23, 1904.]

SUBSCRIPTIONS.—*For Manufacturing Enterprise.*—*Concealment of Material Facts from Subscriber.*—A subscription to a manufacturing enterprise provided that if the owners of certain real estate would locate a factory thereon and plat into lots the remainder, the subscribers would each pay a certain sum for a lot. The persons named as the owners were not in fact the owners, three of them having previously conveyed the land to a trustee, but the title was not in such a condition that it was impossible for them to carry out the agreement. *Held,* that there was not such a concealment or misrepresentation on the part of the promoters as to avoid the contract. *pp. 495, 496.*

TRUSTS.—*Power of Trustee to Convey Land.*—Where a declaration of trust provided that the trustee, to whom had been conveyed certain city lots, was to transfer the lots to those entitled to them under their subscriptions in the aid of a factory, such trustee has the legal title with power to convey to the subscribers, and is not merely a nominal trustee. *pp. 496, 497.*

SUBSCRIPTIONS.—*Declaration of Trusts.*—*Power to Convey Land.*—*Revocation.*—Where a declaration of trust directed the trustees to convey certain lots to various persons who should be entitled thereto under their several subscriptions in aid of a factory, and no authority was reserved by the grantors to revoke the power given the trustees, a subsequent writing directing the trustees to make deeds for lots to whomsoever a person named should direct did not affect the declaration of trust previously executed. *p. 497.*

SAME.—*For Aid of Factory.*—*Purchase of Lots.*—*Distribution by Lot.*—*Lottery.*—A subscription to a manufacturing enterprise provided that the subscribers should pay $100, and each receive a city lot in a certain plat of land. The trustees who held the lots for the purpose were to distribute the lots among the subscribers, by lot, in some fair manner, to be determined by them. Before the terms of the subscriptions were carried out the proposition was abandoned and a second subscription was signed which referred to the former, but provided that the distribution was to be made by a committee of four to be named by the subscribers. The method of distribution and the distribution itself were determined and carried out by the subscribers themselves, and was by withdrawing an envelope containing a number of a lot from a box, and an envelope containing the name of a subscriber from another box. *Held,* that the subscription was not illegal as being in violation of the statute against lotteries. *pp. 497–502.*

McCleary *v.* Chipman.

JUDGMENT.—*Release Without Affecting Liability of Sureties.*—For the purpose of converting real estate into cash the sureties on certain judgments which were liens on the land secured the release of the land from the liens in consideration of which they agreed that the proceeds of the sale of the land should be applied on the liens, and that the release should not affect their liability on the judgments. *Held*, that the release was conclusive as against the judgment creditor, and that the land was freed from such liens. *pp. 502, 503.*

TRUSTS.—*Action by Trustee in His Own Name.*—Trustees who are authorized to collect certain subscriptions may sue in their own names for the use of the party for whom the subscription was made. *pp. 503, 504.*

SUBSCRIPTIONS.—*Deed.*—*Execution by Another than Vendor.*—One who subscribes $100 for a manufacturing enterprise, on condition that he is to receive a deed for a city lot, can not defeat his subscription on the ground that the deed for the lot was not executed by the vendor, but by a third person, where it appears that he made no objection to receiving the deed from such third person at the time it was tendered. *p. 504.*

SAME.—*Collection.*—*Laches.*—*Estoppel.*—Where a subscription in aid of a factory entitled the subscriber to a deed to a city lot when he had paid one half of his subscription, and, relying upon his promise, the factory has been completed according to the contract, and he has not paid anything, nor repudiated his subscription, nor made reply to frequent demands for payment, he must be held to have acquiesced in the delay, and is estopped from claiming that the right to collect the subscription has been lost because of unreasonable delay. *pp. 504, 505.*

SAME.—*Deed.*—*Merchantable Title.*—Where one makes a subscription for the aid of a factory, and is to receive as a part of the consideration a city lot by perfect title, free from encumbrances, the tender of a merchantable title is a sufficient compliance with the contract. *pp. 505, 506.*

TENDER.—*Conditional Tender of Deed.*—Where by the terms of a contract to convey land, the grantee was to comply with certain conditions before he was entitled to a deed, a tender of the deed conditioned on a compliance with the contract is sufficient. *p. 506.*

VENDOR AND PURCHASER.—*Action for Purchase Money.*—*Defense.*—A vendee who is to receive a perfect title when he has paid one-half the purchase price can not defend an action on the contract when he has neither paid nor tendered any part of the purchase money. *pp. 506, 507.*

EXECUTORS AND ADMINISTRATORS. — *Release of Judgment by Executor.*—An executor has general authority to release a judgment lien. *p. 507.*

McCleary v. Chipman.

From Kosciusko Circuit Court; *A. C. Capron*, Special Judge.

Action by Silas W. Chipman and others against John C. McCleary. From a judgment for plaintiffs, defendant appeals. *Affirmed.*

*Edgar Haymond, T. R. Marshall, P. H. Clugston* and *W. F. McNagny*, for appellant.

*W. D. Frazer, J. D. Widaman, J. R. Frazer* and *Odell Oldfather*, for appellees.

Robinson, C. J.—Transferred from the Supreme Court under the act of March 12, 1901:

Error is assigned upon the conclusions of law stated upon a finding of facts substantially as follows: In January or February, 1895, appellant and a large number of other persons proposed in writing to one Huffman to purchase from him, at $100 each, lots for which they subscribed, if Huffman would procure title to a certain tract of land, and erect thereon certain factories, and plat the remainder into city lots. Appellees were named as trustees, authorized to collect the money, distribute the lots "by lot," in a manner to be determined by them; the subscribers agreeing to accept and pay for such lots as should be set off to them. When fifty per cent. of the price of the lots had been paid, Huffman was to convey the lots to the subscribers by perfect title, in fee simple, free from encumbrances; the subscribers to execute their notes in two payments for the residue. Appellant subscribed for one of the lots. Huffman accepted the proposition, but before performing his part of the agreement, except making a plat of 350 lots, which plat was not recorded, assigned his interest therein to the firm of Charles & Co., who assumed Huffman's duties, but who did not carry out the agreement. Afterwards, in March, 1895, appellant, with part of the persons who signed the Huffman proposition, with others, signed a second proposition,

providing that if the owners of the premises would procure the erection of a factory of certain dimensions and capacity, and would plat into lots the land to have been platted in the Huffman proposition, the subscribers would pay for the lots theretofore subscribed for, the sums so subscribed, to the trustees named in that subscription. The proposition stated that it was made to induce some party to erect the factory on the strength thereof. The subscribers appointed a committee of four to act for them and in their names, to look after their interests, authorizing them to permit such changes in the details as they might deem necessary, and to divide the lots among the subscribers, thereby ratifying all that they might do. It is further found that among the subscribers to the first and second propositions were ten of the persons designated as the owners of the premises named in the second proposition; that the lands to be platted were in sections five and eight; that, when the two propositions were made, the persons named in the second proposition as the owners of the land in section eight were not such owners, but that three of the persons so named had previously conveyed the land to one Oldfather, who did not record his deed until July, 1896. When the propositions were made, the subscribers did not know Oldfather owned the premises, but believed the persons named in the second proposition were such owners; that, contemporaneously with the execution of the deed to him, Oldfather orally agreed that he would hold the land in trust for his grantors, convey the same to persons whom they might designate, and reconvey any portion left, which trust Oldfather has ever since recognized, and now does so. The persons named in the second proposition as the owners of the land to be platted did own that part in section five, and on October 31, 1895, they quitclaimed the same to Oldfather, who contemporaneously therewith executed to the grantors a written declaration of trust that the conveyance was

made to him as trustee, and that he would convey the lots
to the parties entitled to such conveyances under the terms
of the subscriptions.   The second proposition was accepted
by the owners, and relying thereon they entered into a
contract with the firm of Charles & Co. for the erection
of a factory; the firm to be paid the proceeds from the
subscriptions.   The factory was erected substantially in
accordance with the requirements of the two propositions,
was in complete running order on July 1, 1895, and since
that time has been operated in compliance with and to
the capacity required in the two propositions.   The sub-
scribers' committee entered upon the discharge of their
duties, approved the location of the factory, such changes
as were made as to the buildings and their locations, the
conveyance of the land to the firm of Charles & Co., the
platting of the rest of the land into lots, and sent to the
subscribers, including appellant, who received the same,
notice of a meeting of the subscribers for the purpose of
disposing of the lots, which notice contained in detail a
plan for distribution which was substantially adopted at
a meeting of the subscribers held afterwards.   The parties
named as owners of the land in the second proposition con-
ceived the plan of disposing of the land, prepared and
circulated the two subscription papers, were the real parties
in interest, claiming to be the owners in interest of the
land, and were to receive the profits of the sale, except
such part as went to the firm of Charles & Co.   On April
16, 1896, Oldfather platted the lands, and recorded the
same; his plat differing from the Huffman plat in not
including as much land by about four and one-half acres,
which was low, wet land, not valuable for building pur-
poses, and of little value for town lots; in changing the
factory site to higher ground, of greater value, and en-
larging the same, and omitting a strip 66 by 400 feet
of the most valuable land.   Otherwise the plats were sub-
stantially the same.   Of the land to be platted in the

McCleary v. Chipman.

Huffman proposition, part was low, wet, and swampy land, which had no value for building purposes, and but little value for any purpose. A depression from five to ten feet deep and fifteen to twenty feet wide ran through a portion of it. Much of it lay remote from roads or streets. Part was high, lay near roads and streets, and was well adapted to building purposes. Of the lots in the Oldfather, plat, part were low and wet, remote from roads and streets, not valuable for building purposes, and of no value for any purpose of more than $3 to $15 per lot. That not to exceed fifty of the lots were adapted to building purposes and had a market value of from $30 to $35 per lot. When the deeds were made to Oldfather, the lands were encumbered with judgment, mortgage, and tax liens of more than $14,000. On December 20, 1900, the State Bank of Warsaw had become the owner of most of these liens, and on that day released the same. None of the liens held by the bank at the date of the release was paid, and they still remain unpaid to the amount of more than $7,000. The distribution of the lots was made in the following manner: The numbers 1 to 350, representing the lots, were written on separate cards, which were placed in envelopes and sealed. Each of the names of the 350 subscribers was written upon a separate card. The cards containing the names of the subscribers were placed in one box and the envelopes containing the lot numbers in another. The boxes were thoroughly shaken, a card containing a name drawn, and simultaneously therewith an envelope containing a lot number. If the subscriber thus drawn had paid $50 on a lot, the envelope was opened and the number of the lot announced; if the subscriber so drawn had not so paid, the card containing the name and the envelope containing the lot number so drawn were put into a larger envelope and sealed. Appellant was not present, and did not participate in the drawing. Not having paid $50 on a lot, the card containing his name

and the envelope containing a lot number drawn with it were sealed in an envelope, which, when afterwards opened, was found to be lot 271, which was part of section five. The firm of Charles & Co., appellee Chipman, who performed all the active duties of the trust, and the landowners, approved the manner of distribution. Charles & Co. will not recover any of the money collected in this suit, but the same will be used to apply upon the liens held by the bank and a certain estate. Before this suit was brought Oldfather tendered to appellant a deed to lot 271, conveying to him a merchantable title in fee, free from encumbrances of all kinds. The lots, streets, and alleys in the plat have not been staked out or marked or identified. Appellant has never taken possession of the lot. About seventy subscribers have paid in full and received deeds, and about one hundred others have made partial payments. The amount of appellant's subscription is now $105, no part of which has been paid. Appellant has never demanded a conveyance of the lot, or an abstract, or possession, and has never rescinded or offered to rescind his subscription.

As conclusions of law the court stated that appellees are entitled to recover $105 and costs, and that appellant is entitled to the possession of the deed tendered.

It is first argued that the findings show misrepresentations and concealment of material facts on the part of those promoting the enterprise. But the record discloses nothing of this character which would prejudice the rights of appellant, or render the contracts unfair. When the second proposition was signed the parties representing themselves to be the owners of the land to be platted, of which lot 271 was a part, were in fact the owners; and three of them owned the other tract, and had previously conveyed it to Oldfather in trust for them. It is not shown that there were any secret equities affecting appellant's rights. At no time was the title to the land in

a condition that it was impossible for them to carry out their part of the agreement. Although they might not have had at all times an unconditional fee simple title, yet they did at all times hold such title as would enable them to comply with their agreement with appellant. The court very fully stated all the facts showing title, and also stated that the deed tendered to appellant was sufficient to convey to him a merchantable title in fee simple to lot 271, free from encumbrances of all kinds. This in effect fulfills the requirement of the contract that the deed should convey to him his lot by a perfect title in fee simple, free from encumbrances of all kinds.

It is argued that the deed from Oldfather conveyed no title. When the grantors conveyed to him that part of the land in section five, the declaration of trust executed at the same time provided that the trustee held the land in trust for his grantors, and was to convey the lots to the various parties who should be entitled to such conveyances under their subscriptions in aid of the factory; such lots to be conveyed when paid for. The trustee accepted the trust, and it became binding upon him. He had knowledge of the prior subscription contracts. Nothing further was to be done by the grantors. It is true, appellant had not paid for the lot, but when the deed was tendered the last payment was long past due. By the declaration of trust he was to convey the lots to those entitled to them under their subscriptions in aid of the factory. Under the contract a subscriber was to receive his deed when he had paid half the price, and was to give his notes for the balance. As the declaration of trust was made with reference to the subscription contract, and as equity looks to the intent rather than to the form, when the declaration of trust requires that the trustee shall make the deed when the lot is paid for, it must be held to mean when paid for according to the terms of the subscription. We do not think it can be said that the trustee was merely a nominal

trustee, but that, for the purpose of carrying out the terms of the subscription contract, the legal title was conveyed to him by his grantors, and the power vested in him to convey the lots to such subscribers as complied with the contract—among them, lot 271 to appellant.   See *Haxton* v. *McClaren,* 132 Ind. 235; *Ewing* v. *Jones,* 130 Ind. 247, 15 L. R. A. 75; *Mohn* v. *Mohn,* 112 Ind. 285; *Wright* v. *Moody,* 116 Ind. 175.

It is also argued that the grantors of the trustee reserved the power to revoke the trust.   But no authority to revoke it is reserved in the instrument creating it.   §3407 Burns 1901.   It is true that subsequent to the execution of the deed to the trustee the grantors gave to him a written order to make deeds for lots to whomsoever a person named should direct.   But this order could not affect the terms of the written declaration of trust previously executed.   It had expressly directed the trustee to convey the lots to certain persons.   The trustee knew of the subscription contracts.   The declaration of trust refers to these subscriptions, and must be construed with reference to the subscription contracts.   He was to convey the lots to the various parties who should be entitled to conveyances under the subscriptions in aid of the factory.   No authority was reserved by the grantors to revoke the power given the trustee and without such reservation the grantors had no such authority.

It is further argued that the contract was illegal in its inception; that the lots were distributed by means of a lottery, which was against public policy, and void.   In the second proposition made by the subscribers they refer to their subscriptions to the first proposition.   In the first proposition, which was practically abandoned, the appellees were named as trustees who were "authorized and required" to distribute the lots among the subscribers by lot; the same to be done in some fair and equitable man-

ner, to be determined by them. In the second proposition
the subscribers named: a committee of four to act for
them, and, among other duties, "to divide such lots among
us, hereby ratifying all that they may do." Taking the
two propositions together as constituting the contract be-
tween the parties, it can not be said that the contract
provides that the lots shall be disposed of by some kind of
lottery. The method of distribution and the distribution
itself were determined and carried out by the subscribers
themselves at a meeting held by them for that purpose.

The court finds that at no time prior to the distribution,
October, 1895, were the details of any plan for the dis-
tribution of the lots among the subscribers ever discussed
or talked about in any manner, or known by any person,
but that it was at all times known to the owners and the
subscribers that the distribution was to be by means of
a lot drawing. It is also found that a notice, which ap-
pellant received, was sent to the subscribers to meet at
a certain time and place to determine upon a plan of
distribution, and to distribute the lots; the notice con-
taining the details of a plan proposed by the subscribers'
committee named in the second proposition; that the meet-
ing was held; that one of the subscribers, not a vendor,
was elected president, and another subscriber, not a vendor,
outlined the plan for the distribution which had been set
forth in the notice, which plan was voted upon by the
subscribers present, and was unanimously adopted by the
meeting. Three of the grantors were present at the meet-
ing, but they were all subscribers, and it does not appear
that they took any active part in the meeting. The firm
of Charles & Co. was not present when the plan of dis-
tribution was determined, but was afterwards present while
the distribution was being made. It is true, the court
finds that the lots, when platted, were of unequal value.
But it is also found that of the land to be platted in
the propositions made by the subscribers, part of it was

wet and swampy, and had no value for building purposes, and little value for any purpose, and, on account of depressions, and distance from roads or streets, the several portions of the lands differed greatly in value.

It seems that the findings show, in effect, that a number of persons agreed, for a consideration named, to buy a tract of land which was afterwards to be platted into lots. Each purchaser was to have as his part of the land one of these lots, for which he was to pay $100. The land was platted into lots, and the purchasers afterwards met and determined among themselves the manner in which the lots should be assigned among them. The contract made by each subscriber was one he had a right to make. It is not shown that the promoters did anything for which they would be liable to indictment for conducting a lottery. Before the meeting held to determine the manner of distribution they had contracted away their interest in the property involved in the transaction. The subscribers were free to act for themselves in any manner they might choose. Induced by a desire to aid an enterprise which they believed would be an advantage to them as citizens, they entered into a lawful contract to buy the land, and afterwards agreed among themselves upon the manner in which it should be divided. Appellant was not present at this meeting. But he had never rescinded nor offered to rescind his subscription, and while his contract was several and not joint, yet the subscribers were in a sense pursuing a common purpose. See *Ft. Wayne, etc., Co.* v. *Miller*, 131 Ind. 499, 506, 14 L. R. A. 804. He was notified of the subscribers' meeting, and the purpose for which the meeting would be held. He continued, without objection, to be a subscriber. He knew the meeting was to be held, and entered no objection, and failed to make any response whatever to the notice received. Under all the circumstances it must be held that he was bound by the result of the meeting. There is nothing

to show that any fraud was practiced as to appellant. Taking the transaction as a whole it can not be characterized as a lottery within the meaning of the law. The sale of the lots to the subscribers was not in pursuance of any design to evade the law or promote a lottery. It was not a plan or scheme on the part of the promoters to sell or dispose of the property by lot or chance. It seems to have been fair and equitable, and we find nothing in it that can be said to be opposed to good morals. See *Washington Glass Co.* v. *Mosbaugh,* 19 Ind. App. 105; *Emshwiler* v. *Tyner,* 21 Ind. App. 347, 69 Am. St. 360; *Wile* v. *Rochester Improv. Co.,* 24 Ind. App. 422; *Chancy Park Land Co.* v. *Hart,* 104 Iowa 592, 73 N. W. 1059.

In *Lynch* v. *Rosenthal,* 144 Ind. 86, 31 L. R. A. 835, 55 Am. St. 168, cited by counsel for appellant as controlling in this appeal, it is said, quoting from *Rothrock* v. *Perkinson,* 61 Ind. 39: "It is well settled in this State that every scheme for the division or disposition of property or money by chance, or any game of hazard, is prohibited by law, and that every contract or agreement in aid of such a scheme is void as against public policy." In that case, "by the definite language of the contract," the lot which appellee agreed to purchase was to be determined by lot. The appellee had no choice whether he was to pay $100 or $300. A prize lot was to be awarded to some one in addition to the lot subscribed for; the prize lot to be awarded to some one by the result of chance. Appellant participated in the drawing, which was conducted according to a plan suggested by him, and not by a plan adopted by the subscribers themselves. In all these particulars that case differs from the case at bar. It can not be said that the rule declared in the above case would prevent three owners in common of a tract of land from dividing the same into three parcels, and then agreeing among themselves to determine by lot the particular part each should have. Under the laws of this State the

right to certain offices is determined by lot when there is a tie vote. §§4331, 6292 Burns 1901. It is true, in the case at bar, in the first proposition the trustees were authorized to distribute the lots among the subscribers "by lot," but this proposition was practically abandoned, and in the second proposition a committee of four subscribers was named, "to divide such lots among us, hereby ratifying all that they may do." This subscribers' committee did afterwards suggest a plan of distribution, which was substantially adopted at the subscribers' meeting afterwards held. It is found as a fact that the vendors had nothing to do with suggesting or adopting the plan.

In *Chancy Park Land Co.* v. *Hart, supra,* where the plan of distribution, adopted by the subscribers themselves, was similar to that in the case at bar, the court said, after quoting certain definitions of a lottery: "It thus appears that there must be some plan or scheme, on the part of the promoters of the enterprise alleged to be unlawful, for the sale or disposition of property by lot or chance, before it can be said to have the character of a lottery. If the sale is without the purpose that the property, or any part of it, shall be obtained by the purchaser through chance, and this does not result from the nature of the transaction, then it is not so tainted. The sale of the lots to the subscribers in this case was not in pursuance of any design to promote a lottery, or in evasion of the law. Each subscriber contracted,—as he had a right to do,— for the purchase of one or more of the lots, with the understanding that they should be apportioned as the subscribers themselves might determine. Having agreed to buy before the land was platted,—induced by a desire to aid an enterprise of anticipated advantage to the city,— they concluded, after much discussion, and the proposal of other plans, to make the selection by drawing the number of a lot and a name from different boxes, at the same time. We know of no good reason why these purchasers

did not have the right to divide their property, or that contracted for, according to their own notions and agreement."

It is further insisted that the findings show appellant's lot was encumbered by valid liens for more than its value. The proposition by the sureties on the judgments made to the State Bank of Warsaw and the Hall estate, and accepted, was that, for the purpose of converting the real estate into cash, and applying the proceeds to the payment of the judgments, the sureties requested the bank and the executor of the Hall estate to release the land from the liens, in consideration of which they agreed that all proceeds for the sale of the land should be applied on the liens, and further agreed that the "release of said real estate shall in no way affect our liability upon said judgments and mortgage notes, and that we and our property will remain bound for the payment thereof, the same as though such release had never been executed." The releases, entered upon the records and properly attested, stated that they were for a valuable consideration. There is no finding that the releases were executed without consideration, and we think the findings show a sufficient consideration. Under the present statute, such a release is conclusive upon the judgment plaintiff, in favor of subsequent purchasers or lien holders in good faith. §590 Burns 1901. In *Conley* v. *Dibber*, 91 Ind. 413, cited by counsel, a county auditor had released a school-fund mortgage; and it was held, in pleading such release, it was necessary to aver that the mortgage had been paid, because without such payment the auditor had no authority to release the mortgage; that a release without payment did not remove the encumbrance. The auditor can release such a mortgage only as the statute directs. §5818 Burns 1901. In *Harris* v. *Boone*, 69 Ind. 300, the release was executed upon a condition that it was not to be binding

McCleary v. Chipman.

until the delivery of certain notes, which were never delivered.

The complaint avers that the suit is brought for the use and benefit of the firm of Charles & Co., and, as the court found that the firm would not recover and would not be entitled to recover any part of the money collected in this suit, it is argued that the findings do not sustain the averments of the complaint. By the first contract appellees were appointed by the subscribers' trustees to collect the subscriptions and pay the money collected to Huffman or his order. Huffman assigned this contract to Charles & Co. By the second contract the subscribers agreed to pay to the trustees named in the first contract the money to be used to secure the factory. By the contract between the vendors and the firm of Charles & Co. the firm purchased from them a tract of land adjoining the plat, to be paid for in three payments, on which they agreed to erect the factory. The firm ordered these payments to be paid to the vendors out of subscription money, the firm to receive the residue of the subscriptions in consideration of the erection of the factory. The deed to the firm was held in escrow until the purchase price was paid. The vendors, not having received the purchase money in full, agreed to turn the same over to the bank and the Hall estate. And while the finding is that the firm will not receive any of the money collected in this suit, yet the collection of the subscription is indirectly for the benefit of the firm, as it is in fact applied on the purchase price of the land purchased by the firm from the vendors. When this has been paid, they will then receive their deed. The subscribers themselves conferred upon the trustees the power to collect the subscriptions, to be used for a certain purpose. The money was made payable to the trustees for the use of some party who would erect the factory. The firm did erect the factory.

As they were authorized to collect the subscriptions, and this authority had not been taken from them by the subscribers, they may sue in their own names. See *Wolcott* v. *Standley,* 62 Ind. 198; *Musselman* v. *Cravens,* 47 Ind. 1.

It is a general rule that a purchaser is not required to accept a conveyance from a third party, but only from his vendor. But in the case at bar the contract provides that the vendors shall convey or cause to be conveyed the lots to the subscribers. It does not appear that when the deed was tendered to appellant he objected to receiving it because it was executed by Oldfather, nor does it appear that he ever gave any reason for refusing to accept the deed. He had been notified when payment was demanded, prior to the tender of the deed, that the lots had been conveyed to Oldfather so as to facilitate the execution of the deeds. The grantors agreed in writing to indemnify Oldfather for any liability he might incur from executing warranty deeds to the subscribers.

Appellant's counsel also argue that appellees have been guilty of laches that bars their right to recover. Time does not seem to have been of the essence of the contract. Appellant was entitled to a deed when he had paid fifty per cent. of the purchase price. He had paid nothing. He made no reply to frequent demands for payment. Relying on the subscribers' promise to pay, the factory was completed according to the contract. It is not shown that appellant was ready at all times to perform the conditions required of him. He gave no reason for refusing to accept the deed when tendered. He knew or had means of knowing his rights as a subscriber. He knew by the notices sent him that the other parties to the contract were relying upon his promise. He made no reply to these notices. He did nothing towards repudiating his subscription; his continued silence was inconsistent with its repudiation. He knew the vendors were still asserting their rights under the

McCleary *v.* Chipman.

contract, that they were relying upon the subscribers' promise, and that they were attempting to enforce the contract. Taking all the facts, it must be concluded that appellant acquiesced in the delay, and can not now be heard to complain.

"When a party," says the author in Pomeroy, Eq. Jurisp. (2d ed.), §965, "with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and of all the material facts, freely does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or lies by for a considerable time and knowingly permits the other party to deal with the subject-matter under the belief that the transaction has been recognized, or freely abstains for a considerable length of time from impeaching it, so that the other party is thereby reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity." See, also, Pomeroy, Eq. Jurisp. (2d ed.), §1408; Story, Eq. Jurisp. (13th ed.), §775; *Bennett* v. *Welch,* 25 Ind. 140, 87 Am. Dec. 354; *Huff* v. *Lawlor,* 45 Ind. 80; *Davis* v. *Heady,* 7 Blackf. 261; *Conwell* v. *Claypool,* 8 Blackf. 124.

It is also argued that the title conveyed to appellant is not free from reasonable doubt. It must be remembered, however, that appellant is not in the position, ordinarily, of a person desiring to purchase. The consideration that induced him to subscribe for the lot was the location and erection of the factory. He placed his own estimate upon the value to him of the erection of the factory. The factory was erected in reliance upon his promise to pay his subscription, and for which he agreed his subscription money was to be expended. The lot was not the sole consideration for the subscription. The court found that the deed tendered was sufficient to convey a merchantable title. This may not be, strictly speaking, a perfect title, as re-

quired by the letter of the contract. But a merchantable title or a marketable title is a good title, and is a substantial compliance with the contract. No facts are disclosed making the title open to reasonable objection. In *Smith* v. *Turner*, 50 Ind. 367, the court said: "But the courts have gone further, and held that the vendor must be able to make a marketable title." And in *Allen* v. *Atkinson*, 21 Mich. 351, Judge Cooley says: "But the vendee had an undoubted right to a good title, and to a deed with proper covenants; * * * and he had a right also to insist that the title should be a marketable one, not open to reasonable objection." See, also, 1 Sugden, Vendors (8th Am. ed.), 510; *Freetly* v. *Barnhart*, 51 Pa. St. 279; *Greenblatt* v. *Hermann*, 144 N. Y. 13, 38 N. E. 966.

The findings show that the tender of the deed to appellant was sufficient. The tender was not absolute, but was restricted by certain conditions, which by the terms of the contract were to be performed by appellant before he was entitled to a deed. Such a conditional tender is valid. *Bruce* v. *Smith*, 44 Ind. 1; *Huff* v. *Lawlor*, 45 Ind. 80; *Lynch* v. *Jennings*, 43 Ind. 276. When the suit was commenced the deed was deposited with the clerk of the court, to be disposed of as ordered by the court. *Goodwine* v. *Morey*, 111 Ind. 68. In *Vawter* v. *Bacon*, 89 Ind. 565, the vendor demanded notes containing provisions in excess of the agreement between the parties. In *King* v. *Finch*, 60 Ind. 420, a tender of the amount due on a note was made at its maturity to a person who had possession of the note, but who stated that he was instructed not to receive the money. Held, that the tender was invalid, that equity can not supply a defect in a tender, and that the maker was liable for interest after maturity.

The fact that there were liens upon the property did not constitute a breach of the contract between the parties. The property was encumbered when the subscriptions were made, but it does not appear appellant made any objection

until after suit was brought. The title was to be good when the deed was made, and the deed was not due until fifty per cent. of the subscription was paid, which appellant neither paid nor tendered. See *Oakey* v. *Cook*, 41 N. J. Eq. 350, 7 Atl. 495.

The executor of the Hall estate had authority to release the Hall judgment. There is no finding that it was executed without consideration. It is not shown there was any fraud or collusion or wasting of the assets of the estate. "The executor," said the court in *Underwood* v. *Sample*, 70 Ind. 446, "has, in this State, a general, and in many respects an absolute, power over the debts due the estate of his testator. When done without fraud or collusion, he may assign or release such debts and may exercise general acts of ownership over them in regard to their security or collection, subject only to his liability on his bond for any loss which may occur by reason of his mismanagement of such debts." See, also, *Latta* v. *Miller*, 109 Ind. 302; *Hamrick* v. *Craven*, 39 Ind. 241; *Weyer* v. *Second Nat. Bank*, 57 Ind. 198.

Judgment affirmed.