## PEARCE v. FREEMAN.

No. 15324—Opinion Filed March 22, 1927.

(Syllabus.)

1. **Vendor and Purchaser—"Merchantable Title."**

A merchantable title is synonymous with a perfect title or a marketable title.

2. **Same.**

A merchantable title is one free from litigation, palpable defects, and grave doubts, and consists of both legal and equitable title fairly deducible of record.

3. **Same—Title "Fairly Deducible from Record."**

"Fairly deducible of record" does not nec-

essarily mean that the county clerk's office of the county wherein the land is situated is the only record to which reference may be had in support of such title, but reference may be made to the judgments of any court of record having jurisdiction in the county where the land lies.

Error from District Court, Garvin County; A. C. Barrett, Judge.

Action by F. J. Pearce against W. M. Freeman for specific performance. Judgment for defendant, and plaintiff brings error. Reversed and remanded.

C. H. Thomason, Carl Henderson, and Albert Rennie, for plaintiff in error.

Wallace & Field and Blanton, Osborn & Curtis, for defendant in error.

HEFNER, J. Pearce sued Freeman for specific performance of a contract of sale of certain real estate. Freeman claimed a breach of the contract in that Pearce had failed to comply with the following clause:

"It is understood by and between the parties hereto that the party of the first part is to furnish a good and merchantable title to the said property. That if the first party has an abstract to this certain property, he is to furnish it; otherwise the abstract is to be furnished and paid for by the second party."

The abstract furnished disclosed that the lands were allotted to Jennie Tannitubi; that Jennie Tannitubi, at the age of four, died February 24, 1904, intestate; that on March 28, 1904, Charles Tannitubi was duly appointed administrator of the estate of said Jennie Tannitubi, deceased, for the purpose of selecting lands for allotment in the name of the said decedent. That on March 29, 1904, said administrator selected the lands the title to which is in question in this suit, and that a certificate of allotment was issued March 29, 1904. It further appears that one Amelia Tannitubi had made a birth affidavit, as proof prerequisite to the enrollment of the said Jennie Tannitubi as a citizen of the Choctaw Nation. In birth affidavit, filed in 1903, it was disclosed on the verity of the said Amelia Tannitubi and one Patsy Choate, who acted as midwife, that there was born to Charlie Tannitubi and Amelia Tannitubi, on the 9th day of September, 1900, one Jennie Tannitubi. The facts disclosed by said affidavit were by the Commission adjudged to be true, and the said Jennie Tannitubi was placed upon the rolls of the citizens of the Choctaw Nation, one of the Five Civilized Tribes, which enrollment was the basis of the right to select an allotment and have

patent issued for the 20 acres of land the title to which is drawn in issue herein.

Under these facts it becomes necessary for us to determine what is meant by the term "a merchantable title." We shall consider, first, whether or not, in contracts relating to real estate, there is any distinction in the terms "perfect title," "merchantable title," or "marketable title."

In the case of Dobson v. Zimmerman, 118 S. W. 237, in the 9th paragraph of the syllabus, the Texas court said:

"A 'perfect title' is one that is merchantable or marketable. * * *"

In the case of McCleary v. Chipman (Ind. App.) 68 N. E. 320, it is held that a perfect title means a merchantable title.

In the case of Ross v. Smiley (Colo.) 70 Pac. 766, this language appears:

"A perfect title in this connection is synonymous with a marketable title."

We therefore conclude that a perfect title, a merchantable title, or a marketable title, when used in connection with the sale of real estate, means one and the same thing. Having reached this conclusion, we shall next determine what is meant by the term "marketable title."

In the case of Gwin v. Calegaris, 73 Pac. 851, the Supreme Court of California in the first paragraph of the syllabus uses this language:

"Where a contract for the sale of land provided that the purchaser should be allowed to examine the title, and, if the same was not perfect and satisfactory, the earnest money should be returned, but if the title was perfect and satisfactory, and the balance of the price was not paid on the execution of a deed, the earnest money should be forfeited, the purchaser was entitled to a good record title, and not one depending on adverse possession, or matters resting entirely in parol."

In the case of Turner v. McDonald, 18 Pac. 262, the Supreme Court of California said:

"A good title is one free of grave doubts and fairly deducible of record."

The first time this question was before the Supreme Court of this state it cited and approved the California doctrine, and in the case of Campbell v. Harsh, 31 Okla. 436, 122 Pac. 127, the second paragraph of the syllabus is as follows:

"A perfect title is one free from litigation, palpable defects, and grave doubts, and consists of both legal and equitable title fairly deducible of record."

We think the rule laid down in the Camp-

bell Case, supra, is sound, and especially applicable to this state, particularly to the East Side, where there are so many titles commonly designated as "dead claims." A great many of the Indians are ignorant and cannot even speak the English language. Under these circumstances the affidavits cannot be very reliable and a purchaser should not be required to depend upon them for the safety of his title.

In examining abstracts, lawyers often find affidavits as to heirship absolutely conflicting with each other, and in some cases made by the same individuals. If we should hold that specific performance could be enforced where the title was not shown to be reasonably good by the record, lawyers, who examine titles, would meet with many difficulties. In some cases the heirship might be direct, as in the case at bar; in other cases it might include collateral kindred and distant relatives, but if proper affidavits were presented showing the proper relation and the proper heirship, then it would be the duty of the court to enforce specific performance regardless of how far removed the heirship might be. There are several reasons why this rule should not be followed: (1) The purchaser should be given a title fairly deducible from the record. (2) A lawyer examining a title should not be required to pass upon the truthfulness of the affidavits submitted. (3) The affidavits are not entitled to record. (4) They could not be introduced in evidence in case of a contest over the land. (5) The persons who make the affidavits must necessarily, sooner or later, die, and, after death, the evidence could not be produced in court in case of a contest as to who are the heirs.

We therefore hold that a marketable title is one free from litigation, palpable defects, grave doubts, and consists of both legal and equitable title fairly deducible from the record.

Does the title before us come within these rules? The allottee was a full-blood Choctaw Indian, and died at the age of four years, and before the land had been allotted, and therefore, could not have left any debts. **Under an Act of Congress, it was necessary for this allotment to be made by a duly appointed administrator.** The administrator was so appointed by a court of record, and the land was allotted by the administrator. This is certainly a sufficient adjudication of the death of the original allottee, and inasmuch as the child died in infancy, under the restrictions as they existed at that time, no debts could possibly have existed

that could have been a lien on the land. This, therefore, is a sufficient showing both as to the death and as to the debts.

In addition to the facts hereinbefore stated, on January 26, 1905, the plaintiff in error instituted an action in the United States Court for the Indian Territory at Pauls Valley, in what is now Garvin county, to quiet title in himself against Charles Tannitubi and Amelia Tannitubi, the father and mother of the deceased allottee, Jennie Tannitubi. In its decree the court found that Charles Tannitubi was the father, and Amelia Tannitubi was the mother of Jennie Tannitubi, and rendered judgment adjudicating the heirship of said Jennie Tannitubi, and quieting title in the plaintiff in error. This judgment was filed for record at Pauls Valley June 29, 1906. While this decree is not technically what is known as a "decree of heirship," still it is clearly shown that Charles Tannitubi and Amelia Tannitubi were the father and mother of the deceased allottee. As a matter of law, we take judicial knowledge of the fact that the father and mother were the sole and only possible heirs. They being the only possible heirs, and both being parties to the suit, it was not necessary to make the unknown heirs of the deceased allottee parties to the suit, because in this case the heirs are definitely and positively known. Had the father or mother, or both of them, been dead, then the heirship of the original allottee would have been a serious question. Suppose that the father and mother had been dead, and the United States court in the decree above mentioned had found that a brother and sister were the sole heirs? There might have been another brother or sister, but there could not have been another father or mother.

As stated above, the death of the original allottee was judicially determined in the appointment of her administrator, and by a court of record. Under the law there could be no debts against the allottee that could have been a lien on the land. All of these things being true, we think it is a sufficient bridge over the hiatus in the chain of title caused by the death of the original allottee.

Under the facts of this case we hold that the title is fairly deducible from the records, and to uphold it that it is not necessary to go aliunde the record to procure affidavits as to death, heirship, and debts.

This case is altogether different from what is ordinarily known as a "dead claim" title, and we think the facts bring it within the rules laid down by us as to what constitutes a marketable title.

The judgment of the lower court is therefore reversed, and the cause remanded.

BRANSON, C. J., and HARRISON, PHELPS, LESTER, HUNT, CLARK, and RILEY, JJ., concur.